CHARLES GRATIOT, PLAINTIFF IN ERROR, *v.* THE UNITED STATES, DEFENDANTS IN ERROR.

The United States instituted a suit against Charles Gratiot to recover a balance alleged to be due by him for money paid to him as "Chief Engineer in the service of the United States," as shown by two Treasury transcripts. The claims of General Gratiot against the United States, as offsets to the demand against him, which had been exhibited to the accounting officers of the Treasury, were for commissions on disbursements of public money at Fortress Monroe and Fort Calhoun, being two dollars per day during the times of the disbursements; and which two dollars per day were charged, separately, for each day; and for extra services in conducting the civil works of internal improvement, carried on by the United States. In the Circuit Court, the evidence offered to prove the set-off claimed by the defendant, was rejected. Held, that unless some law can be shown establishing clearly and unequivocally the illegality of each of the items of set-off, and no such law exists, the refusal of the Circuit Court to admit the evidence cannot be supported. It was competent and relevant evidence, and proper for the consideration of the jury, as conducing to the establishment of the facts.

Certain requisitions had been paid to General Gratiot on account of Fort Grand Terre, and other public works, as stated in a transcript of the Treasury of the United States; and it was contended that this transcript was not evidence in an action against "the Chief Engineer," as the transcript did not state the money to have been paid to him in that capacity. Held, that the balance claimed in this action from the defendant, was upon a transcript from the Treasury including those items, which had been charged to him as Chief Engineer; and as there was no distinct charge on the transcript objected to, the refusal of the Circuit Court to sustain the objection was proper. ·

The United States possess the general right to apply all sums due to an officer in the service of the United States for pay and emoluments, to the extinguishment of any balances due to them by such officer, on any other account; whether as a private individual, or an officer of the United States. It is but the exercise of the common right which belongs to every creditor to apply the unappropriated moneys of his debtor in his hands, in the extinguishment of the debts due by him.

It is wholly immaterial whether the claim to set-off against the United States be a legal or an equitable claim: in either view it constitutes a good ground of set-off or deduction. It is not sufficient that these items ought to be rejected, that there is no positive law which expressly provides for, or fixes such allowances. There are many authorities conferred on the different departments of the government, which, for their due execution, require services and duties which are not strictly appertaining to, or devolved upon, any particular officer, and which require agencies of a discretionary nature. In such cases, the department charged with the execution of the particular authority, business, or duty, has always been deemed incidentally to possess the right to employ the proper persons to perform the same, as the appropriate means to carry into effect the required end; and, also, the right, where the

[Gratiot v. The United States.]

service or duty is an extra service or duty, to allow the person so employed a suitable compensation.

Cited: The United States v. Wilkins, 6 Wheat. 135. The United States v. Ripley, 7 Peters, 18. The United States v. M'Daniel, 7 Peters, 1. The United States v. Fillebrown, 7 Peters, 28.

The act of Congress of the 16th March, 1802, which provided for the organization and establishment of the corps of Engineers, never has been supposed to authorize the President of the United States to employ the corps of Engineers for any other duty except such as belongs either to military engineering, or to civil engineering. Assuming, that the President possessed the fullest power under the act to employ from time to time, every officer of the corps in the business of civil engineering, still it must be obvious, that as their pay and emoluments, were or would be regulated with reference to their ordinary military and other duties, the power of the President to detach them upon other civil services would not preclude him from contracting to allow such detached officers a proper compensation for any extra services. Such a contract may not only be established by proof of some positive regulation, but may also be inferred from some practice and usage of the War Department in similar cases, acting in obedience to the presumed orders of the President.

The regulations of the army of the United States, which were sanctioned by the President in 1821, art. 67, and in 1825, art. 67, which allow two dollars per diem, not to exceed two and a half per cent. on the sum disbursed, to the agents for disbursing money at fortifications, do not limit this allowance to the Engineer superintending the construction and disbursing the money, as agent for fortifications, to a single per diem allowance of two dollars for all the fortifications for which a distinct appropriation has been made; when he is employed at the same time upon several fortifications, each requiring separate accounts of the disbursements to be kept on account of there being distinct and independent appropriations therefor. It would be unreasonable to suppose that these regulations intended to give the same amount of compensation to a person disbursing money upon two or more distinct fortifications, that he would be entitled to if he were disbursing agent for one only; although his duties might be thus doubled, and even trebled.

A claim of set-off was presented for thirty seven thousand two hundred and sixty-two dollars and forty-six cents, for extra services in conducting the affairs connected with the civil works of internal improvement. Held, that, upon its face, this item has no just foundation in law; and the evidence offered in support of it, if admitted, would not have sustained it. Upon a review of the laws and regulations of the government, applicable to the subject, it is apparent that the services therein alleged to be performed, were the ordinary special duties appertaining to the office of Chief Engineer, and which the Chief Engineer was bound to perform; and without any compensation beyond his salary and emoluments as a Brigadier General of the Army of the United States, on account of such services.

IN error to the Circuit Court of the United States for the District of Missouri.

An action was instituted in the Circuit Court of the United States for the District of Missouri, by the United States against

[Gratiot *v.* The United States.]

Charles Gratiot, late Ch: f Engineer, to recover a sum of money alleged to have been received by him, "as Chief Engineer," to the use of the United States. The defendant pleaded non assumpsit, and a set-off; and the jury found a verdict for the plaintiff for thirty-one thousand and fifty-six dollars and ninety-three cents, under the charge of the Court. The defendant tendered four bills of exceptions, and prosecuted this writ of error; a judgment having been given by the Court for the amount of the verdict.

The plea of set-off was as follows: the defendant says the United States ought not to have and maintain the action against him, because at the commencement of the suit, and still, the United States were and are indebted to him a large sum of money, exceeding the amount claimed by them, for work, labour, care, diligence, and responsibility by him before the commencement of the suit, done and performed, in and about the affairs of the plaintiff, at the request of the United States, and for performing the duties of agent for fortifications at Fortress Monroe and Fort Calhoun, two fortifications of the United States, for ten years; and for disbursing and expending in the construction of the fortifications to the amount of three millions of dollars; and for receiving and disbursing a large sum of money in and about the repairs and contingencies of fortifications; and for work and labour, care, diligence, skill, and responsibility, done and incurred about the civil works of internal improvement of the United States, not pertaining to his ordinary and regular duties as Chief Engineer of the United States.

The evidence offered to the jury by the plaintiffs, was two documents, purporting to be "Transcripts of the Treasury," and duly certified, the last of which exhibited a balance charged against the defendant, of twenty-nine thousand, two hundred and ninety-two dollars, and thirteen cents. This transcript also contained a statement of the claims of the defendant against the United States, which had been presented to the Treasury, and disallowed. Among the claims so presented, and in part disallowed, were the following:

For disbursing $603,727 42, on account of Fort
    Calhoun, from the 13th November, 1821, to 30th
    September, 1829, being 2879 days, at $2 per day,

being less than two and a half per cent. on the amount disbursed, as allowed by the regulations of the army, to an officer disbursing at a fortification,    .    .    .    .    .    .    $5,758

For disbursing $848,718 80, on account of Fort Monroe, during the same period, 2879 days, at $2 per day,    .    .    .    .    .    5,758

                                                    11,516

For disbursing $33,447 26, on account of contingencies of fortifications at 2½ per cent., as authorized by regulations above referred to,    .    836 18

This sum for extra services, in conducting the affairs connected with the civil works of internal improvements carried on by the United States, and referred to the Engineer Department for execution, and which did not constitute any part of his duties as a military officer, from the 1st day of August, 1828, to the 6th day of December, 1838, inclusive, ten years and one hundred and twenty-eight days, at $3,600 per annum, that being the pay granted to John S. Sullivan, David Shriver, James Geddes, and Nathan S. Roberts, Esqrs., civil engineers, employed under the act of 30th April, 1824, entitled, "an act to procure the necessary surveys, plans, and estimates upon the subject of roads and canals."    .    .    .    .    .    $37,262 46

The said transcripts showed, that of the two first items of claim above mentioned, the sum of five thousand seven hundred and fifty-eight dollars was disallowed by said accounting officers, and that the like sum of five thousand seven hundred and fifty-eight dollars was allowed to said defendant, for the said disbursments, at the rate of one dollar per day, for each of said forts, Monroe and Calhoun, for the time specified in the defendant's claim.

After the plaintiffs had closed their evidence, the defendant (relying on the plaintiff's evidence to show the claims he had presented to the Treasury Department, as matters of set-off, and which had been disallowed by said Department, so as to let in his evidence as to the pay) was proceeding to offer evidence in

support of the claims presented and disallowed, as above speci-
fied, when the District Attorney, on the part of the plaintiffs,
moved the Court to exclude all evidence which the defendant
might offer in support of the items of claim above specified and
disallowed; which motion was by the Court sustained: and the
Court refused to permit the defendant to give any evidence in
support of the disallowed items of claim above specified.    The
defendant excepted.

The transcripts also showed the objections, by the auditor, to
the charge of thirty-seven thousand two hundred and sixty-two
dollars, and forty-six cents.    They were :—

"This is a new claim, now for the first time presented by
General Gratiot.    Lieutenant Colonel Gratiot, of the corps
of engineers, was made a full colonel on the 24th May, 1828,
and on the 30th of July, 1828, assumed his station, as chief of
the corps of engineers, at the seat of government, as required by
the general regulations of the army, of 1825.    Art. 67, par. 887,
directs "that the chief of the corps of engineers shall be stationed
at the seat of government, and shall direct and regulate the duties
of the corps of engineers, and those also of such of the topo-
graphical engineers, as may be attached to the Engineer Depart-
ment, and shall also be the inspector of the Military Academy,
and be charged with its correspondence."

888. "The duties of the Engineer Department comprise recon-
noitring and surveying for military purposes, and for internal
improvements, together with the collection and preservation of
topographical and geographical memoirs and drawings referring
to those objects," &c.    "Also the superintendence of the execu-
tion of the acts of Congress in relation to internal improvements,
by roads and canals, the navigation of rivers, and the repairs
and improvements connected with the harbours of the United
States, or to the entrance into the same, which may be authorized
by acts of Congress, with the execution of which the War De-
partment may be charged."

By these regulations, it is made the express duty of the chief
of the corps of engineers to superintend the execution of the acts
of Congress in relation to all works of internal improvement, and
it does not appear in these or any subsequent regulations, or in
any of the acts of Congress authorizing works of internal im-.

provement, that any extra allowance was ever made, or contemplated to be made to the chief of the corps of engineers, for extra services, nor can the services here charged for, be deemed extra, when, by the regulations in force before and at the time of his assuming the duties of his office, were in part the very duties he was, by his appointment, directed to perform; and, further, on the 26th March, 1829, Col. Gratiot received a brevet of brigadier general, to take effect from the day that he received his promotion as colonel, on the 24th May, 1828, and with it all the pay and emoluments of a brigadier general, besides double rations allowed to him, in consequence of his promotion and residence at the seat of government. The brevet rank was unquestionably conferred upon Gen. Gratiot in consequence of his new command as chief of the corps of engineers, to whom was confided the superintendence of all works of internal improvement, as appears by the regulation before mentioned; and in that way was he compensated for all the duties he was required to perform. On the 30th June, 1831, the Secretary of War established a separate bureau for the topographical department, and directed a transfer from the office of the Chief Engineer, of the correspondence connected with the topographical department, to that bureau; thus relieving the chief of the Engineer Department from the direction and superintendence of all that portion of duty which, by the regulations of 1825, above recited, he was charged with.

The cases cited by Gen. Gratiot, of pay granted to John S. Sullivan, David Shriver, James Geddes, and Nathan S. Roberts, civil engineers, are by no means analogous to his claim; they were civil engineers, appointed by the Secretary of War, in virtue of an act of Congress, and charged with the performance of certain specific duties, and for which they were paid, out of an appropriation for that purpose, a compensation fixed by the Secretary of War; they held no military rank, nor received compensation from the Government, in any other capacity, or for any other service. Not so with Gen. Gratiot: he was an officer of the army, exercising a position as chief of the corps of engineers, and in virtue of which had received the brevet rank of brigadier general, and the pay and emoluments of his brevet, beside double rations. It is fair to presume that the brevet was conferred, in part, in consequence of the increased number of

persons and the importance of the works under his charge, pro-
duced in a great measure by the appointment of Civil Engineers
and their attendants; besides, the act of the 3d March, 1835, ex-
pressly prohibits any extra allowance whatsoever, to any officer
of the army. See act entitled "an act making additional appro-
priations for the Delaware breakwater, and for certain harbours,
and removing obstructions in and at the mouths of certain rivers,
for the year 1835."

The defendant's second bill of exceptions, was to the refusal of
the Court to charge the jury, that the United States were not
entitled to recover in the action, for any public money received
by the defendant, in any other capacity or office, than that of
" Chief Engineer;" and secondly, that three items in one of the
Treasury transcripts, charged against the defendant, as " General
Charles Gratiot," were not evidence of money had, and re-
ceived by the defendant, to the use of the plaintiff. They
were :

To requisition No. 4,476, dated 17th November,
   1835, on account fort at Grand Terre, - - - $20,000 00
To requisition No. 4,575, dated 21st December,
   1835, on account fort at Grand Terre, - - - 30,000 00
To requisition No. 4,728, dated 26th January,
   1836, on account Fort Columbus, and Castle
   Williams, - - - - - - - 3,000 00
Fort at Throg's Neck, - - - - - - 47,956 62

                                       $100,956 62

The Court refused the instructions; being of opinion " that the
defendant is charged by the declaration, with moneys received
by him, while acting in the capacity of chief engineer, but the
United States have not introduced any evidence, save the two
Treasury transcripts, to sustain the declaration. By these, it
appears that the sums claimed of the defendant, were placed in
his hands as Chief Engineer, in 1835, to be expended in works at
Grand Terre, in Louisiana; about thirty thousand dollars of
which had been retained. The balance due from the defendant,
when he was appointed Chief Engineer, was carried to his ac-
count, at and after that date, and became part thereof; and was af-
terwards extinguished, and he fully credited; that is, in 1838. The

instruction asked, was therefore refused; because there is no subject matter growing out of the plaintiff's evidence, to which the instruction could apply, if given."

The defendant's third bill of exceptions was to the refusal of the Court to allow evidence offered by him to be given to the jury, being the depositions of witnesses, with the documents annexed to the same respectively, (which depositions, and docu- ments are hereinafter set out,) for the purpose of proving, that he had rendered services to the United States, over and above the ordinary and regular duties of his office; and the value of such extra services, and the established usage and practice of the government, in allowing to engineers, and other officers, their claims for extra compensation for like services; to the reading of which, in evidence, the District Attorney, on behalf of the United States, objected, alleging that the same was incompetent and irrelevant; and waived all objection to the regularity of the taking of said testimony, the same having been taken by the consent of parties; and it being admitted by the defendant, that the services rendered by him for the United States, which he in- tended to prove, by said depositions and documents, and for which, he claimed extra compensation, were the same services for which he claimed an allowance, by the accounting officers of the Treasury Department, which claims had been presented and disallowed, as appears by the Treasury transcripts given in evidence by the plaintiff, and made part of the first bill of ex- ceptions. Which objection so made by the District Attorney, was sustained by the Court.

The defendant's fourth bill of exceptions was, that the defend- ant moved the Court to instruct the jury that: 1–2. The Treasu- ry transcripts given in evidence, were defective and illegal, and did not prove the plaintiff's demand, as stated in the declaration, and put in issue.

3. That the items charged against the defendant as Chief Engi- neer, in the Treasury transcript, marked A, which has been given in evidence and stated as follows, (which see in said transcript:) " 1829, Aug. 18. To balance on settlement, No. 8,879,

on account of fortifications, - $8,086 61
On account of repairs and contin-
gencies, - - - - - 11,522 44

1829, Aug. 22. To balance on settlement, No. 8,903,.

on account of Fort Calhoun, - 42,751 13

On account of Fort Monroe, - - 12,604 12"

being charges in gross, without the items, going to show said balances are not competent evidence to charge the defendant in this action.

4. That the plaintiff cannot recover in this action against the defendant, in any character or office, other than that of Chief Engineer.

5. That the defendant is not chargeable in this action, with any public moneys received by him in any other capacity than as Chief Engineer; and the accounting officers of the Treasury Department ought not to blend in the same account charges against him as Chief Engineer, and as an engineer officer superintending the construction of Forts Monroe and Calhoun; and that the said accounting officers had no legal right, without the consent of the defendant first had, to extinguish the balance re-. ported against him in the account now before the jury, on account of his superintendency of the construction of said Forts Monroe and Calhoun, by setting off against that reported balance, the amount due to the defendant for his pay and emoluments as a general of the army, and while he was Chief Engineer, the payment of which pay and emoluments had been stopped; but that he has now the right to claim it as a credit upon, or set-off against the claim preferred against him as Chief Engineer, if it appear on the Treasury transcript aforesaid, before the jury, that the pay and emoluments aforesaid have been allowed or credited to him by the accounting officers of the Treasury, but never actually paid to him.

The Court refused to give the first, third, and fifth instruction as moved for; gave the second instruction as moved, and also gave the fourth instruction, with a qualification in the following words in writing: " Given with this explanation, that it appears from the account A, that the indebtment, the defendant is charged with, is for moneys received by him as Chief Engineer." The defendant excepted.

The case was argued by Mr. Brent, and Mr. Jones, for the plaintiff in error; and by Mr. Gilpin, Attorney General, for the United States.

[Gratiot v. The United States.]

For the plaintiff in error it was contended,

1st. That the Court erred in refusing to allow the items set-off in the appellant's account, and disallowed by the accounting officer of the treasury, to go to the jury, as proper matters of set-off to the plaintiff's demand; as pleaded by the appellant in his plea of set-off, on which the plaintiffs took issue.

2d. That there was error in the refusal to allow the appellant to give evidence in support of his claims as a set-off; and which claims had been presented to, and disallowed by, the proper accounting officer of the Treasury.

3d. That there was error in permitting certain items named in the second bill of exceptions to be given in evidence by the United States in this suit; and, also, in refusing to instruct the jury, that the plaintiffs were not entitled to recover moneys received by the appellant in another capacity or office than that of Chief Engineer.

4th. That the Court erred in rejecting the evidence contained in the third and fourth bills of exceptions.

5. That there was error in not giving the first, third, and fifth instructions; and in giving the explanation and qualification in the fourth exception, asked by the plaintiff in error.

6th. That there was error in admitting the Treasury transcripts in evidence; the same not being such as the law requires to make them evidence for the United States.

Mr. Brent and Mr. Jones, for the plaintiff in error, contended that the services required by law from the Chief Engineer, were different from those required from officers of the army. 7 Laws U. S. 487. 575. 8 Laws U. S. 575. 338. 288. 492, 493. 635. 811. 9 Laws U. S. 98, 99. 248.

Having shown that by no laws of the United States the duties performed by General Gratiot were required, and that the services were extra official; they contended that there were no army regulations which imposed upon that officer those duties. The army regulations did not apply to the Chief Engineer.

If any of those regulations can be construed to apply to the Chief Engineer, they were never sanctioned by the President of the United States. They were violations of the Constitution, which gives to Congress, alone, the power to establish army regulations. They could not, therefore, be valid.

The reasoning of the Auditor, when he rejected the claims of General Gratiot, was not warranted by the facts in the case; nor by the facts alleged by him on which he drew his conclusions. The brevet rank conferred on General Gratiot, had no connexion with the services performed by him. If the reasons for the rejection of the claim, and the facts on which they rest are not correct, the claim should be sustained.

The evidence which was offered on the part of the plaintiff in error, in the Circuit Court, was entirely proper. It went to show the equitable circumstances under which the claim for compensation was made, and the general practice of the department to make such allowances. This course has been sanctioned by this Court; in the cases of The United States v. M'Daniel; The United States v. Fillebrown; and The United States v. Ripley, in 1 Peters.

The irregularity of the transcript, as evidence, to charge General Gratiot with money paid to him not as Chief Engineer, is shown by the decision of this Court, in the case of The United States v. Orr, 6 Peters, 375.

The question under the exception to the regularity of this evidence, is, primarily, one of variance between the proof and the declaration. The declaration charges the receipt of money to General Gratiot in a particular capacity, as Chief Engineer. The money was not so received, and is not so charged in the second transcript. It could not, therefore, be evidence.

The principle of law is well established, that although an averment may not be necessary, yet, when it is made, it must be fulfilled. This is the law; while it would have been different had there been a general averment, yet, when a particular one is made, it must be supported by evidence.

The proposition of the Attorney General is, that if the services, for which charges are made by General Gratiot, were extra, all that he did was part of the duties attached to his office as Chief Engineer. If this is correct, the allowances which have been made at the department to engineers and officers of the topographical corps, must be declared incorrect. So, too, allowances which have been made to the highest officers of the government; as to the Attorney General of the United States, when performing the duties of Secretary at War. Evidence of these allow-

ances was offered, but was excluded by the ruling of the Circuit Court. Cited 4 Story's Laws of the United States, 2372. 2404, as to extra compensation for repairing roads by the military.

As to the claims for compensation for disbursements at Fortress Monroe, and Fort Calhoun, the counsel contended that the establishments were distinct; the services were distinct; and the responsibility separate and independent; whether performed by one person or by two, they were equally the subject of distinct compensation. The accounts were separately kept, and adjusted by settlements at the Treasury. The allowance to the same officer has been made by the Treasury as claimed by General Gratiot, as is fully shown by the evidence rejected by the Circuit Court.

The counsel for the plaintiff in error also submitted to the Court, as part of their argument, the opinions of counsel on the claims rejected by the Treasury. These opinions were as follow.

Mr. Jones, in his opinion stated:—2. Compensation for "extra services" connected with the practical execution of certain works of internal improvement, provided for by acts of Congress.

The services for which compensation is claimed, under this head, were clearly extra-official, without having any stated compensation appointed for them by law; they were such as the government might have employed and paid any private individual to perform. That any officer, no matter what his denomination or rank, civil or military, who is employed by the government to perform such services, is entitled to such reasonable compensation, over and above his official salary or pay, as any private individual might have claimed if employed to perform the same services; and that the rate and amount of his compensation are to be liquidated by such standards of value or merit, and according to such usages in similar lines of business, as in transactions between private individuals, has all been long and conclusively settled by the most unquestionable precedent and authority.

The act of Congress (30th April, 1824) directing certain surveys, &c., and assigning certain duties, in execution of the act, to "officers of the corps of engineers," does not include in those duties any part of the services for which General Gratiot claims compensation. That act neither directs nor authorizes the execution of any work of internal improvement whatever; it merely takes certain preparatory steps, and provides for col-

lecting such information as may enable Congress, at some future time, and by subsequent and independent legislation, to judge of the expediency of setting on foot such works, and of providing for their execution; and with that view, it authorizes the President to cause " surveys, plans, and estimates to be made of the routes of such roads and canals as he may deem of national importance ;" it also authorizes him to employ officers of engineers, or other persons, in preparing these materials for future legislation. The results of these preliminary investigations are required by the act to be reported to Congress; they were so reported; and it then remained for Congress alone, at some future time, to provide for the execution of such of the works as those results may have shown to be practicable and expedient. With the execution of these "surveys, plans, and estimates," the entire execution of the directions and purposes of the act of Congress was completed, and all the duties assigned by the act to officers of the engineer corps were executed and determined. When Congress did afterwards provide, by substantive acts of legislation, for the construction of any of these works, without assigning any further duties to officers of the engineer corps, such officers had no official concern whatever with those works; the works were to be carried on exclusively by civil, not by military means and instruments. Of course, when the government employed any officer of the corps in any branch of the business connected with the practical execution of the works, it was an employment purely extra-official; for which he was just as well entitled to extra-official compensation, and to the same rule and rate of compensation, as if he had not been clothed with any official character."

Mr. Binney:—I have considered the questions discussed in General Jones's opinion, and as, upon his statement of General Gratiot's claims I agree in all points, it might be sufficient to express my assent generally; but I think that an additional remark will be found to fortify General Jones's interpretation of the Army Regulations of 1821; the part of the case which appears to present the greatest difficulty.

The objection to General Gratiot's claim to distinct compensation for distinct services in disbursing money for Fortress Monroe, and also for Fortress Calhoun, seems, while the Army

Regulations of 1821 applied to the case, to rest upon the suggestion that he was performing the duties of but one agent, and therefore was entitled only to two dollars per diem for the whole collective service : that he was substituted by the 14th section of article 67, for an officer who is spoken of as an agent for fortifications, and was not to be substituted except where there was "no agent for fortifications;" and, therefore, that being substituted for the performance of a general or collective service, the two dollars per diem is all that he could claim, whether he performed the agent's duties at one or at ten fortifications.

This is a question of interpretation of the 14th clause of the 67th article.

The remark I have to make is, that the Army Regulations of 1821 do not speak of any such officer as an agent for fortifications generally and collectively. The 7th section of the 67th article says :—" there shall be appointed as many agents for fortifications as the service may require." They might be one, or one hundred in number, according to the necessities of the service ; but from the nature of the duties assigned to them by the Army Regulations, they must have been agents for some fortification or fortifications in particular, and not for two or more jointly or generally. Two, or any other number of fortifications, might have been placed by the Department under the agency of the same person, and he might by agreement have received one compensation for the performance of his duties at all the posts ; but the agency for each would have been, by its prescribed duties, a separate agency for each, and not a joint or collective agency for the whole.

This is shown by all the sections of article 67, from the 7tl to the 13th inclusive ; for, although they speak of agents and fortifications in the plural, they do so with reference to duties of disbursing and accounting, which necessarily belong to the agent in regard to each fortification separately, and not to two or more fortifications jointly. It is out of the question to suppose that the Army Regulations meant to authorize or to require the blending in one account of the disbursements, the articles purchased, the labourers employed, and the abstracts made out, for two or more fortifications jointly; the appropriations, which are for fortifica-

tions separately, would all be confounded by it; and if this was not intended, then they meant to regard the duty of disbursing and accounting as a separate service in regard to each fortification; and it is so to be understood throughout, notwithstanding the use of the word fortifications in the plural.

It follows that this word, wherever it is found in this part of the Army Regulations of 1821, is to be considered as used distributively, and not collectively, as comprehending two or more fortresses within the limits of a joint duty.

When the 14th section declares that "where there is no agent for fortifications," the superintending officer shall perform the duties of an agent, it consequently does not mean that where there is no agent having the collective duty of disbursing for all fortifications, the superintending officer shall perform that collective duty; but using the word distributively, it means to say that where there is no agent for a fortification to be constructed, the superintending officer shall perform the duties of agent in regard to the fortification in question: and when it says, that as a compensation for the performance of that extra duty he will be allowed, for moneys expended by him in the construction of "fortifications," at the rate of two dollars per diem, it means to use the word with the same effect, and to give the compensation as distributively as the service.

If this be not so, the superintending officer would be entitled to nothing for moneys expended by him in the construction of a single fortification. The word is "fortifications," and if it is to be understood only of more than one, then nothing is to be allowed for one; and if it is to be understood of one or more, then it is to be understood of each one as a separate service and duty, as it is before described;" and the compensation allowed for the service must be separate also. If the superintending officer is required by his superior to undertake the duty of agent for Fortress A to day, and for Fortress B to-morrow, and for Fortress C the next day, and all these duties were prosecuted for years, they are not one collective service, but three separate services; and it is the same thing if all are ordered and begun on the same day. They would be separate agencies, though but one agent performed the whole, and he received but one general

compensation; and the account of the appropriations for the three fortresses would not be truly kept, unless the general compensation was duly apportioned among them.

This I conceive is the effect of the Army Regulations of 1821, as it more plainly is of the Regulations of 1825. Each fortification is separate in appropriation, separate in disbursement, and separate in agency. It is meant also to be separate in compensation for agency. It might not be material to the agent or to the Department, that the compensation should be separately estimated for each fortification of two or more confided to the same agent: though, as I have said, I do not see how the appropriation can be truly accounted for except by a due apportionment of the aggregate compensation among the several fortifications. But when a specific compensation is allowed, reason and justice require that it should have reference to a specific or definite service; and hence, in the case of such a compensation, the very limitation enters into the interpretation of the clause. What is the service intended to be compensated by two dollars per diem? Is it the definite service of disbursing for one fortification, or the variable but always increasing service of disbursing for from one to ten? If it be the latter, there are gross inconveniences, which are not to be encountered, unless clear language requires it. If it be the former, the interpretation becomes the more reasonable, from its just and reasonable consequences. The prescribed compensation, therefore, sustains the interpretation that the service referred to was separate and distinct for each fortification, as the separate nature of the service sustains the interpretation, that the prescribed compensation was to be allowed in as many instances as there should be fortifications to be superintended.

Upon the other points of General Jones's opinion it is unnecessary for me to make a remark. I concur with him in all points. Since the cases of The United States v. M'Daniel, the same v. Fillebrown, and the same v. Ripley, reported in 7 Peters, it is not to be doubted that an officer of the United States, performing, under the lawful sanction of a Department, extra services, which do not come within the line of his official duty, is entitled to an allowance, to be graduated by the amount paid for like services under similar circumstances."

Mr. GILPIN, the Attorney General, for the United States.

On the 2d of March, 1819, the plaintiff, then an officer of engineers in the army of the United States, was ordered to Old Point Comfort, to take charge of the works there building, at the two fortifications, Fort Monroe and Fort Calhoun. These works form part of a united system of defence for Hampton Roads; and are separated by a channel or arm of the sea, about a mile wide. On the 8th of November, 1821, the disbursing agent then at the post was removed, and the plaintiff was directed to " take upon himself the disbursements of the public money, agreeably to the regulations for the government of the Engineer Department;" which he did. Until the 30th of June, 1825, he rendered his regular quarterly accounts, and charged and received credit for two dollars per diem, as his compensation for these disbursements. He kept separate heads of account, for the disbursements at Fort Monroe, and at Fort Calhoun. In his quarterly account, rendered on the 30th of September, 1825, he for the first time charged four dollars per diem, being a separate compensation of two dollars, for the disbursements at each work. The second per diem was disallowed at the Treasury. On the 1st of August, 1828, the plaintiff became Chief Engineer, and removed to Washington; but continued in charge of the works at Old Point Comfort, until the 30th of September, 1829. In his final account then rendered, he charged a second per diem from November, 1821, amounting to five thousand seven hundred and fifty-eight dollars, which, on its settlement at the Treasury, was disallowed, together with some other items, amounting to three thousand two hundred dollars and ninety-one cents, and making together eight thousand nine hundred and fifty-eight dollars and ninety-one cents. This balance remained unpaid; and on the 26th of March, 1833, the plaintiff presented a new account as "agent of fortifications at Forts Monroe and Calhoun." In this he relinquished both per diem allowances, and made one general charge of one per cent. commission, from November, 1821, to September, 1829. This was also disallowed at the Treasury.

On the 30th of June, 1834, Congress made an appropriation of fifty thousand dollars, for " a fort at Grand Terre." The whole of this sum was drawn from the Treasury by General

Gratiot, as Chief Engineer, in November, and December, 1835. On the 6th of October, 1836, he repaid into the Treasury fifteen thousand dollars thereof, retaining thirty-five thousand dollars, in addition to the balance of eight thousand nine hundred and fifty-eight dollars and ninety-one cents, charged against him for the disbursements at Old Point Comfort.

On the 1st of April, 1836, the pay and allowances to which General Gratiot was entitled, were stopped; and the amount thereof directed to be appropriated to the extinguishment of his debt to the United States. On the 15th of December, 1838, his accounts were again adjusted. The sums stopped from his pay and allowances, to the amount of eight thousand nine hundred and fifty-eight dollars and ninety-one cents, were applied so as entirely to extinguish the balance charged against him for disbursements at Old Point Comfort. He was also credited with a sum of one thousand eight hundred and five dollars and eight cents, which he had disbursed for the fort at Grand Terre, and with one thousand five hundred and twenty dollars and forty-seven cents, stopped from his pay and allowances, which reduced the balance due from him, to thirty-one thousand six hundred and seventy-four dollars and forty-five cents. This was further reduced, on account of allowances for transportation, expenses of some journeys, and other items, by the sum of two thousand three hundred and eighty-two dollars and thirty-two cents, leaving in his hands, unexpended and unaccounted for, of the thirty-five thousand dollars drawn from the Treasury, for the fort at Grand Terre, the sum of twenty-nine thousand two hundred and ninety-two dollars and thirteen cents.

As an offset to this, General Gratiot, on the 11th of January, 1839, presented a new account at the Treasury, in which he renewed his first claim of five thousand seven hundred and fifty-eight dollars, for a second per diem, for disbursements at Old Point Comfort; and added thereto a claim of eight hundred and sixteen dollars and eighteen cents, being a commission of two and a half per cent. on disbursements made by him, of "contingencies for fortifications;" and also a claim of thirty-seven thousand two hundred and sixty-two dollars and forty-four cents, as compensation for extra services, in conducting works of civil engineering, from 1828 to 1838, at the rate of three thousand

2 G 2                    45

six hundred dollars per annum, in addition to his pay. These claims, which would, if allowed, have extinguished the balance against him, and left the United States largely in debt to him, were disallowed at the Treasury.

In February, 1839, a suit was brought against him by the United States, in the Circuit Court, for the District of Missouri. It was tried in April, 1840, and resulted in a verdict in favour of the United States, for thirty-one thousand and fifty-six dollars and ninety-three cents. On the trial, the only evidence given by the United States, was a Treasury transcript, containing the accounts and settlements made at the Treasury, with the claims of General Gratiot, and the grounds of their disallowance. He offered, on his part, certain documentary evidence, with a view to sustain the three items of his claim for set-off, but it was entirely rejected by the Court. Four bills of exceptions were sealed by the Court, at the request of the defendant; but they embrace substantially only the two questions, whether the Court properly admitted the Treasury transcript, as evidence to sustain the demand of the United States; and whether it properly rejected the evidence offered by the defendant below, with a view to sustain his set-off. These also form the entire ground of the present proceedings in error.

I. There were four objections taken to the Treasury transcript; that it did not show that the balance demanded was, as stated in the declaration, for moneys received by the defendant, " as Chief Engineer;" that it charged him, not with moneys received, but merely with " requisitions" therefor; that it set out " balances" due, without the items of which they were composed; and that it credited his account for disbursements, as an agent of fortifications, with the pay and allowances subsequently accruing to him as Chief Engineer.

1. The slightest examination of the Treasury transcript, or of the state of the accounts of General Gratiot, shows that, in point of fact, no money was sued for, except what was received by him as Chief Engineer. The balance of eight thousand nine hundred and fifty-eight dollars and ninety-one cents, due on account of his disbursements at Old Point Comfort, was entirely extinguished on the settlement of his account in December, 1838. The only sum remaining then in his hands, was that drawn by

him from the Treasury, as Chief Engineer, to apply to the erection of the fort at Grand Terre. That the United States had a right thus to extinguish the balance first accruing by applying to it the first moneys received from the debtor, is too clear to be contested. The whole account was solely between these two parties; no one but themselves was affected by, or interested in the settlement; no objection was made by General Gratiot, at the time; there was no request for any different application of the moneys. The propriety, therefore, of extinguishing the first debt, cannot be doubted. United States v. January, 7 Cranch, 572. United States v. Kirkpatrick, 9 Wheaton, 720. Cremer v. Higginson, 1 Mason, 323. United States v. Wardwell, 5 Mason, 87. Armstrong v. United States, Peters's C. C. R. 46. Postmaster General v. Norvell, Gilpin, 125. 132. The first debt being extinguished, all that was sued for was a debt incurred as Chief Engineer, as set out in the declaration. The Treasury transcript shows it to be money drawn on his own requisition, "as Chief Engineer." This answers the objection; but even if all this did not appear by the Treasury transcript, his mere receipt of the money which is sued for, from the Treasury, while he was Chief Engineer, would sustain the declaration. In the case of the United States v. Walton, 9 Wheaton, 651, this Court held a declaration against the defendant, as an individual, to be sustained by a Treasury transcript against him as a Receiver; and say that the evidence of moneys received in the latter capacity, is sufficient. The reverse holds equally good. Where there are no third parties interested, proof of the receipt of the money for the use of the plaintiff is sufficient. So in the case of Smith v. The United States, 5 Peters, 302, this Court say, that official transactions are evidence of official character; and in that of the United States v. Buford, 3 Peters, 28, they held, that the mere fact of public money being paid by one officer to another, is proof that the payment was received by the latter in his existing official capacity. On the same principle, the payment of money from the Treasury to General Gratiot, while he was Chief Engineer, sustains the declaration, without further proof.

2. An examination of the Treasury transcript will also show that General Gratiot was not charged, as is alleged, with "requisitions." It is, on the contrary, a general account for "moneys

advanced." The requisitions, under which each item-of-advance is made, are, indeed, separately stated; and the general object of them is not repeated; had it been, the objection could not have been made. It depends, therefore, on no actual error in the account; no false or indistinct charge; but is a mere matter of form, in which it would seem that the usage of the accounting officers is altogether the more simple and correct. There is no similarity whatever with the case of an account, held by this Court to be insufficient, (United States, v. Jones, 8 Peters' Rep. 381,) which charges an officer with "orders" or "bills of exchange," without the production of, or further evidence in regard to those instruments. It does not follow, in such cases, that the payment is justly chargeable by the United States to the officer. That must depend on the nature of the order, or the bill of exchange. But an advance of money from the Treasury to a disbursing officer, on his own requisition, is evidence that it was money received by him for the use of the United States.

3. It is not denied that a Treasury transcript, charging an officer with "balances" in gross, and not stating the items which compose them, is insufficient evidence. Unquestionably, it must contain a full statement of the items of the account, so as to exhibit every credit, and every charge necessary to enable the jury to do entire justice between the parties. United States v. Jones, 8 Peters, 383. Now, in all this series of accounts between the United States and General Gratiot, it never has been alleged that a single erroneous charge has been made against him, or that any credits have been refused him, except those which are contested in this suit, not upon any ground of error in fact, but merely as to their legal propriety. His own balance, as set out in the statement of differences annexed to the transcript, agrees with that of the United States, if the items contested on legal grounds shall be admitted. If, therefore, the Treasury transcript did not contain all the items which compose any of the balances, it is evident that no injustice would have been done thereby to General Gratiot, in presenting his case to the jury. But, not resting upon this ground, the fact is, that the transcript does contain every item of which these balances are composed. It only requires an examination of the transcript to see that there is a complete and detailed account of.

every charge and credit; and the balances objected to are merely rests in the account, during its progress, and when different settlements were made. Taking the whole transcript together, (which must be done, unless each successive settlement is to embrace all the details of the previous one,) it is plain that every item is to be found from first to last.

4. The objection that the pay and allowances of General Gratiot, which were stopped after the 1st of April, 1836, should have been applied to the reduction of the balance due from him for the money drawn from the Treasury, for the fort at Grand Terre, and not to the extinguishment of the balance due on his account for disbursements at Old Point Comfort, is answered by the observations made in reply to the first objection to the transcript. The application of the moneys coming into the hands of the United States from their debtor, and not appropriated by him, is to be made in such manner as they deem expedient. There was no objection by General Gratiot to this mode of appropriation; the money received had no relation to the one debt more than to the other; the right so to appropriate, which was clearly vested in the United States, as creditors, was not affected or controlled by any circumstance, equitable or legal.

II. The principal ground on which it is sought to reverse the judgment of the Circuit Court of Missouri, is the rejection, by the Court, of evidence offered by the defendant below to sustain his plea of set-off. Now it is not denied by the plaintiff in error, that the sole object of this evidence was to support those identical claims, and no others, which, as to their nature and amount, were set out in the Treasury transcript that was in evidence and went before the jury. It is admitted, on our part, that, if the Court rejected evidence of any fact which was a legal ground of set-off; or credit, they erred. The question, therefore, resolves itself into the inquiry, whether the particular items of claim, as set out in the Treasury transcript, were, if proved, a legal ground of offset by General Gratiot against the United States. The items are three in number. The first is a claim for five thousand seven hundred and fifty-eight dollars for a second per diem allowance for the disbursements made at Old Point Comfort. The second is a claim for eight hundred and sixteen dollars and eighteen cents for disbursing "contingencies of fortifications." The third is a

claim for three thousand six hundred dollars per annum, in addition to his pay, during the whole time he was Chief Engineer, for services in conducting works of civil engineering. It is submitted that each of these claims is contrary to law; and, therefore, that the Court properly refused to receive any evidence to support them.

1. The plaintiff in error took the direction, as an officer of engineers, of the fortifications at Old Point Comfort. While there, he became the disbursing officer, in place of the agent of fortifications. He took exactly the place of that agent. It was his duty to do so. The regulations of the army required it; and those regulations were made in pursuance of law, and constituted a legal obligation. 2 Story's Laws, 1000. 1312. . 3 Story's Laws, 1576. 1811. 1852. Had they not been recognised by law, it would have been properly within the power and authority of the War Department to make them. 7 Peters, 14. These regulations prescribed the duty, and fixed the compensation. This duty was, to take the place of the " agent of fortifications." " Where there is no agent for fortifications, the superintending officer shall perform the duties of agent; and while performing such duties, the rules and regulations for the government of such agents shall be applicable to him." Army Regulations of 1821, Engineer Department, art. 67. pp. 166, 167. This regulation was in force when the plaintiff in error commenced performing the duties of the agent of fortifications at Old Point Comfort. In 1825, while he was still performing them, a new set of regulations was adopted. . They declared that " the engineer, superintending the construction of a fortification will disburse the moneys applied to the same." Army Regulations of 1825, par. 893, p. 170. The compensation allowed to an agent of fortifications, was a commission of two and a half per cent. on the moneys he disbursed, but he received no other pay or allowances. When his duties were assumed by an officer of the corps of engineers, that officer was allowed to receive the same commissions, but as he received also his pay and allowances as an officer of the army, their amount was limited not to exceed two dollars a day. " As a compensation for the performance of that extra duty," say the Regulations of 1821, p. 167, " he will be allowed for moneys expended by him, in the construction of fortifications, at the rate of two dollars

per diem, during the continuance of such disbursements; provided the whole amount of emolument shall not exceed two and a half per cent. on the sum expended:" and in those of 1825, p. 110, it is said, "as a compensation for the performance of that extra duty, he will be allowed at the rate of two dollars per diem, during the continuance of such disbursements; provided the whole amount of emoluments shall not exceed two and a half per cent. on the sum disbursed." It seems impossible to doubt the intention of this provision; it was meant to substitute the engineer officer for the agent. Col. Gratiot was to do exactly what the agent did; for that extra service, "the whole amount of his emoluments" was not to exceed two dollars a day, in addition to his pay. If a single agent had more than one work under his agency, and an officer was put in his place, then "the whole amount of his additional emoluments" was allowed for the performance of this additional duty. The plaintiff in error called himself the "agent of fortifications." His extra duty was a single one; it was the assumption of that discharged by the person whose place he took; his allowance was a commission, "during the continuance" of that duty, of two and a half per cent., or of two dollars a day. There is not a word to be found in the language or fair construction of the regulations, that indicates an intention to allow a single officer, charged with the same duty as a single agent, whose place he takes, a double rate of compensation. It is, besides, a per diem allowance; an allowance for the additional work "of the day." This is not necessarily increased by the number of contiguous works in charge of a single agent. Thus, at the harbour of New York, in 1836, (9 Laws of United States, 458,) there were three works in charge of one officer, for which Congress appropriated twenty thousand dollars; and, in the same year, at the harbour of Newport, was one work in charge of an officer, for which they appropriated two hundred thousand dollars. Could it be intended that the former was to receive three times the amount of extra compensation that the latter did, while the amount of extra labour was only one tenth as much; and when an "agent of fortifications," for whom each was substituted, would, at the latter place, have received ten times as much as at the former? There would be neither reason nor justice in such a construction. Besides, the uniform usage of the army

and the war department has been otherwise.  General Macomb,
himself for a long while the Chief Engineer, and now at the head
of the army, states the settled construction to have been but a
single allowance.  The testimony of the accounting officers,
offered by the plaintiff in error in the Court below, corroborates
that of General Macomb; and of numerous instances adduced,
where a single officer has had more than one fortification under
his charge, none are found, in which the double per diem allow-
ance now claimed, has been made or sanctioned.  The record
in this case shows, that between 1820 and 1838, more than thir-
teen millions of dollars were disbursed by officers of engineers
at various posts; it is well known that, at many of them, there
are several separate works contiguous to each other, and included
in a single superintendency.  What stronger proof of a just as
well as a settled construction could be desired, than a uniform
practice through so long a period?  The argument that the duties
of the agent are increased, because there are more works included
in his agency, is founded on an erroneous assumption of fact.
In the first place, if the amount of disbursement be not increased
by the additional number of works, (and, in many instances, as
we have seen, it is actually less,) there is, in reality, no increase
of labour; but, besides, the supposed multiplication of accounts
does not, as will be seen by the Treasury transcript, exist in
reality; the account of the agent is but a single one, merely de-
signating, under separate heads, the place of expenditure, in accord-
ance with the designation of the appropriation, as made by law.

2. The charge of two and a half per cent. commissions, for
disbursing contingencies of fortifications, is so clearly contrary to
law, that all evidence to sustain it was properly rejected.  Ad-
mitting the disbursement to have been made, as charged, such
an allowance, therefore, could not be lawfully claimed.  The
army regulations, above referred to, declare that "the whole
amount of emoluments" is to be the per diem allowance of two
dollars; this is to be for the performance of the entire extra duty
of disbursements; of course this charge of commission, in addition
to the per diem allowance, is directly contrary to the provisions
of these regulations; and they have the force and authority of
law, in regard to the subjects properly falling within their pur-
view.  If even the plaintiff in error could have offered any proof

[Gratiot v. The United States.]

of usage in favour of such an allowance, (and the rejected evidence contains none such,) yet that would not have warranted its admission, in the face of so clear a legal provision, forbidding such an allowance. Nor is there any force in the argument, that these disbursements may have been other than those at Forts Monroe and Calhoun, for which the per diem allowance is claimed; because it appeared by the account of the plaintiff in error himself, annexed to the Treasury transcript, and already before the Court, when the evidence to sustain this claim was rejected, that these disbursements for contingencies of fortifications, were, in fact, a part of those made by him at Forts Monroe and Calhoun.

3. The last and largest offset, claimed by the plaintiff in error, is the gross sum of thirty-seven thousand two hundred and sixty-two dollars, and forty-six cents, for "extra services in conducting the affairs connected with the civil works of internal improvement, carried on by the United States, and referred to the Engineer Department for execution," during a period somewhat exceeding ten years, while he was Chief Engineer. For these he claims the same annual salary, in addition to his pay, which was given to Mr. Sullivan, and other civil engineers, who were specially employed, under the provisions of the act of Congress of 30th April, 1824. 3 Story's Laws, 1940. This salary was three thousand six hundred dollars. This claim appeared, for the first time, in the accounts of General Gratiot, on the 11th January, 1839, after his removal from office. Never before had it been made in any of his various accounts. It is a charge for his own extra services, and for his alone, in regard to civil works of internal improvement, referred to the department of which he was an officer. What did he in fact, do? In 1828, he "assumed his station at the seat of government as Chief Engineer;" he continued there till December, 1838; he made no disbursements on any of these civil works of internal improvements; he made no explorations or surveys; he examined no localities, ran no lines, surveyed no harbours, built no piers; he performed none of the services which were actually performed by the civil engineers, specially employed, whose salary he claims. As the head of the engineer office, stationed at Washington, he superintended the execution of duties of this sort, referred to his office, as he

superintended other duties referred to it. Such was the sum of his services. Was this within the line of his official functions, or was it not? It is submitted, that he was bound to perform it, by the clear intent of the acts of Congress, by the regulations of the War Department, and by the established construction always given to those regulations; nor was there any point in which it was analogous to any service performed by the civil engineers, whose salary he claims.

. The whole series of legislation, in regard to the engineer corps and to these works, shows that when the latter were required to be done by law, they came appropriately within the superintendance of the former. The act of 9th May, 1794, (1 Story's Laws, 336,) which constitutes the corps, gives it no specific du ies, but places it generally under the orders of the President to perform appropriate services on the coast or the frontiers. In 1802 (2 Story's Laws, 835) it was reorganized to "do such service as the President should direct," clearly embracing every service relating to engineering, which it might become the duty of the President to have executed, whether military or civil. The act of 10th April, 1806, section 1, article 63, (2 Story's Laws, 1000,) distinctly authorizes the President to employ the engineers out of the line of their merely military profession; and, in 1812, when the corps was increased, (2 Story's Laws, 1241,) and some arrangements made in regard to the military academy, which is a part of the corps, a professor of engineering "in all its branches," that is, civil as well as military, was appointed. In 1813, (2 Story's Laws, 1312,) the topographical department of the corps was constituted; clearly indicating that such works of topography and survey were regarded by Congress as a branch of the services falling within the appropriate superintendence of the head of the corps. In 1818, (6 Laws of United States, 360,) we find the officers of engineers joined with those of the navy, in surveying the waters of the Chesapeake. In 1821, (3 Story's Laws, 1810,) when the army was reorganized, the corps was continued exactly as it had previously existed, with the same powers and duties; and when, in 1838, (9 Laws of United States,) its topographical branch was increased, the employment of civil engineers to aid it was forbidden. The number of its bureau officers and clerks was increased as the civil works of internal

improvement referred to it were increased. Biennial Register of 1828, p. 72. 79; and of 1837, p. 104. 118. This series of laws exhibits the organization of a separate department, having a military officer as its chief, forming an executive office at Washington, which was to superintend all the subjects appropriately belonging to "engineering in all its branches," that might be referred to it, either directly by law, or by the President in the execution of duties devolved on him by law. If we examine the legislation of Congress upon these subjects, it will be found to indicate a similar intention. As early as 1817, (6 Laws of United States, 219,) the opening of the Chickasaw road was intrusted to "the direction of the Secretary of War." In 1819, (6 Laws of United States, 368,) the appropriations for surveying the watercourses west of the Mississippi are among those for the military service. In 1820, (6 Laws of United States, 483,) the general "military" appropriation bill, contains a series of appropriations for surveys of streams, rivers, and roads. In 1822, (7 Laws of United States, 82,) are similar appropriations among those for the "military service" of that year. In 1824, (3 Story's Laws, 1940,) the President is authorized to employ civil engineers in addition to "the officers of the engineer corps" and such others as he may direct, to make surveys for internal improvements. In 1825, 1826, and 1827, (7 Laws of United States, 338, 451, 537,) the appropriations for continuing these and making other surveys are embraced in the bill for the "military service" of those years. In 1828, and subsequently, there was a separate appropriation bill for these works of internal improvement, referring to them as under the superintendence of the War Department. 8 Laws of United States, 72. 389. Here, then, is a series of laws showing that, from the earliest period when these civil works of internal improvement became the subjects of legislation, they were regarded by Congress as appropriately belonging to the War Department and the military service. To what office of that department, or to what branch of that service could they belong, but to the department and corps of engineers? What duty of the head of that corps could be more evident and appropriate than the superintendence of them?

The Army Regulations are uniformly in accordance with this

view of the legislation of Congress. As early as those of 1806, (Army Regulations, art. 63,) when appropriations for civil works of improvement in the states, were almost, if not entirely, unknown, we find this corps directed to perform such special duties as the President shall assign them, even out of the line of their profession. Those of 1816, p. 96, repeat the same regulation. In 1821 (Army Regulations, art. 67) it is expressly declared, that "the chief of the corps of engineers shall be stationed at the seat of government, and shall be charged with the superintendence of the corps of engineers to which that of the topographical engineers is attached." In 1825, when civil works of internal improvement became the subject of large appropriations, a still more definite reference to them was introduced into the Army Regulations. Regulations of 1825, art. 67, par. 888. By them it was provided, that "the duties of the engineer department comprise reconnoitring and surveying for military purposes and for internal improvements, together with the collection and preservation of topographical and geographical memoirs, and drawings referring to those objects; the selection of sites, the formation of plans and estimates, the construction, repair, and inspection of fortifications, and the disbursement of the sums appropriated for the fulfilment of those objects, severally, comprising those of the military academy; also, the superintendence of the execution of the acts of Congress, in relation to internal improvement by roads, canals, the navigation of rivers, and the repairs and improvements connected with the harbours of the United States or the entrance into the same, which may be authorized by acts of Congress, with the execution of which the War Department may be charged." These regulations, thus specific, were in force when General Gratiot became the Chief Engineer; and, in 1835, while he still occupied that post, on a revision of the Army Regulations which must be presumed to have passed, in relation to his own branch, under his own immediate notice, we find the superintendence of these works classed among the regular duties of his department. Regulations of 1835, p. 156. The Regulations, also, of the Academy at West Point, p. 11, include civil engineering as one branch of the course of instruction properly embraced under the class of "engineering." Can it be argued, in the face of these regulations,

that the Chief Engineer, stationed at the seat of government, is performing an extra service in superintending the acts of the subordinate officers of his corps, while employed on these works, any more than when they are employed on a fortification? Is it an extra service to receive, examine, file, or submit to Congress the reports they may make from time to time, in regard to one more than in regard to the other?

These questions are not more distinctly answered, by the explicit language of the regulation, which has been referred to, than by the uniform construction put upon it by the officers of the corps themselves. The public documents for years past, contain the annual reports to Congress, made by the Chief Engineers, including General Gratiot. The works of civil construction will be found to be stated, and reported upon, with the same regularity as those for military purposes. No intimation will be discovered, through a series of years, that the former were less appropriately attached to the department than the latter. This record exhibits an effort by General Gratiot, to extract from the files of the departments, some evidence to show that such services had been regarded as extra services; but no single case to establish that point, has resulted from that endeavour. If even it had been shown, that the actual services in the field of officers of engineers, on civil works of internal improvement, had been regarded as duties extraneous to their profession, this would have afforded no analogy to the case of the head of the engineer office, who, at the seat of government, merely superintends the acts of his subordinate officers; but no instance, even of that kind, has been produced. The few cases cited of extra allowances to officers of engineers, are found, upon examination, to depend upon circumstances, which totally and explicitly distinguish them from those where the officers of the corps have been employed upon civil works "referred to the Engineer Department for execution." Of all the numerous works, which, under the skilful practical superintendence of this corps, have during the last fifteen or twenty years developed the resources of various parts of the United States, improved their harbours, and facilitated their internal communications; on which so many millions of dollars have been spent; which have been the subjects, at every session, of careful and detailed reports to Congress;

of all these none have been regarded by the officers of engineers, who had the actual charge and execution of them, as works of extra service; yet, with how much more justice might their labours have been so regarded, if the law or regulations of the army would have borne such a construction, than the mere official supervision of them, by the chief of their corps at Washington.

The Civil Engineers, whose whole annual compensation General Gratiot takes as the standard of an allowance to himself, in addition to the pay, emoluments, and allowances received besides, by the Chief Engineer, to an amount, as appears by the public documents, of not less than six thousand dollars; these Civil Engineers were not only specially engaged, by the direct authority of an act of Congress, but their duties were the arduous and responsible services of the field. Long lines of survey were explored and located by them; minute estimates and reports, filling many pages of the public documents, show the nature and extent of their labours; journeys, and explorations of months, were their ordinary services to the public; their whole time was engaged by the duties for which this compensation was bestowed. If the services of the plaintiff in error, for which he claims to retain, in addition to his pay, more than the thirty-five thousand dollars drawn by him from the Treasury for the erection of the fort at Grand Terre, were not services falling within the line of his duty, as Chief Engineer, they are yet services totally different from those to which he represents them as analogous; and the compensation allowed for the latter, affords no evidence whatever, of the propriety of the allowance that is claimed.

Is there, then, any foundation in law, whatever, for this claim? Is there any doubt but that the services were clearly such as belonged to the office General Gratiot held; such as he was bound by law and the regulations of the army to perform, without any additional compensation? If so, by what authority was he entitled to offer evidence to sustain it? In what respect did the Court err, by rejecting entirely all testimony which was presented for that purpose? It formed no legal or equitable ground of credit. If proved in every particular it came within no rule ever laid down by this Court, in regard to the admission of such

offsets. It is, therefore, submitted, that the Court did not err, in rejecting all evidence offered for the purpose of sustaining this claim.

The counsel for the plaintiff in error has elaborately argued against the application to this claim of the provision of the act of 3d of March, 1835, (9 Laws of the United States, 207,) which prohibits an officer of the army from receiving any extra allowance, unless the same be authorized by law, on the ground, that the provision in question, is applicable only to the appropriations made during the year 1835. It is submitted to the Court, that the provision is a permanent regulation, applicable to subsequent appropriations, as well as to those of 1835; but that act is not relied upon in the present case, on behalf of the United States, as furnishing the ground on which the Court were bound to reject this evidence; for the claim of the plaintiff was for many services anterior thereto. Had all these services of General Gratiot been rendered subsequently to the 3d of March, 1835, it would then have been contended that, if they were in fact extraneous, yet, that all compensation for them was prohibited by that law; and on that ground, that all evidence to sustain them, should have been rejected. As it is, the ground relied upon, is that the services for which this compensation is asked, clearly appertained to the ordinary official duties of the Chief Engineer.

It is submitted, therefore, that all these claims, whether for an additional per diem allowance, a commission for disbursing the contingencies of fortifications, or an extra compensation for superintending civil works of internal improvement, are contrary to law, and could not, if established by the evidence offered in every particular, be a legal offset to the claim of the United States, for the repayment of the money drawn by General Gratiot, from the Treasury, in the year 1835, for the avowed purpose of applying it to the erection of the fort at Grand Terre; but which has been retained by him, and never, with the exception of one thousand eight hundred and five dollars and eight cents, applied, in fact, to that or any other public object. If the Court shall be satisfied upon these points, there was then no error in the decisions of the Circuit Court, and its judgment ought to be affirmed.

Mr. Justice STORY delivered the opinion of the Court.

This is the case of a writ of error to the Circuit Court of the District of Missouri. The original action was assumpsit, brought by the United States against General Gratiot, the plaintiff in error; as Chief Engineer, for fifty thousand dollars alleged in the declaration to be money had and received by him as Chief Engineer, to the use of the United States. At the trial, the controversy turned mainly as to the merits of three items of set-off, or credit, which were claimed by the defendant in the reduction or extinguishment of the supposed debt due to the United States.

These items were as follows:

1. For disbursing $603,727 42, on account of Fort Calhoun, from the 13th of November, 1821, to the 30th of September, 1829, being 2879 days, at $2 per day, being less than two and a half per cent. on the amount disbursed, as allowed by the regulations of the army to an officer disbursing at a fortification,     $5,758 00

2. For disbursing $33,447,36 on account of contingencies of fortifications, at 2½ per cent., as authorized by the regulations above referred to,     816 18

3. For extra services in conducting the affairs connected with the civil works of internal improvement carried on by the United States, and referred to the Engineer Department for execution: and which did not constitute any part of his duties as a military officer; from the 1st day of August, 1828, to the 6th day of December, 1838, inclusive, ten years and one hundred and twenty-eight days, at 3000 dollars per annum,     37,262 46

These items had all been disallowed by the Treasury Department, for reasons stated by the proper accounting officers, and spread upon the record; and were insisted upon as just and proper allowances by the defendant.

The jury at the trial found a verdict for the United States, upon which judgment was entered; and from that judgment the present writ of error has been brought to this Court.

Four several bills of exceptions were taken at the trial on

behalf of the defendant. The first was taken to the refusal of the Court to allow any evidence to be given in support of either of these items of claim. The third was to a like refusal of the Court to allow certain depositions and documents, offered by the defendant, to be given in evidence to prove that he had rendered services to the United States, over and above the ordinary and regular duties of his office, and the value of such services; and the established usage and practice of the government in allowing to engineers and other officers their claims for extra compensation for like services. The second and fourth exceptions proceeded upon minor points in the case. The second asked the instruction of the Court that the United States were not entitled to recover for any public money received by the defendant in any other capacity or office than that of Chief Engineer; and that certain requisitions, stated in the exception, on account of Fort Grand Terre, and Fort Columbus, and Castle Williams, and the Fort at Throg's Neck, were not evidence of money had and received by the defendant to the use of the United States. The Court refused these instructions, because there was no subject matter growing out of the evidence for the United States, to which the instructions could apply, if given; inasmuch as it appeared from the Treasury transcript, given in evidence, that the balance sued for was of sums placed in the hands of the defendant, as Chief Engineer, in 1835, to be expended on the works at Grand Terre; and therefore, in effect, the money sued for was received by him in his capacity of Engineer. We are of opinion that these instructions were rightly refused by the Court, for the reasons given by the Circuit Court; and for the additional reason, that the first was afterwards virtually given upon the prayer of the defendant on the fourth exception, so far as it was applicable to the case; and the second asked the opinion of the Court upon a matter of fact proper for the cognisance of the jury.

The fourth exception, so far as it has not been already disposed of, asked the Court to instruct the jury, that the items charged against the defendant, as Chief Engineer, in the Treasury transcript, marked A, which was given in evidence, consisting of certain balances charged in gross without the items going to show the said balances, were not competent evidence to charge

47

the defendant in the action. This instruction the Court refused to give, and in our judgment, rightly; for taking the whole transcript together, and examining its details, as a mere matter of account, it is plain that all the items on which these balances are struck, are there to be found regularly entered and brought forward. The supposed objection, then, which was stated by this Court in the case of The United States v. Jones, 8 Peters, 375. 383, as to mere naked balances on the transcript, did not apply.

There is another instruction asked under this exception, in a complicated form, but which mainly turns upon the consideration whether the Treasury Department had a right to deduct the pay and emoluments of the defendant, as a General of the army, and while he was Chief Engineer, by setting them off against the balance reported against him, on account of his superintendency of Forts Monroe and Calhoun. In our judgment, the point involves no serious difficulty. The United States possess the general right to apply all sums due for such pay and emoluments, to the extinguishment of any balances due to them by the defendant on any other account, whether owed by him as a private individual, or as Chief Engineer. It is but the exercise of the common right, which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him.

Having disposed of these minor points, we now come to those arising under the first and third exceptions, and which constitute the only real difficulty in the case.

The first exception, under which the Court excluded all evidence in support of the three items of credit disallowed by the Treasury Department, is certainly well founded; unless it is clear in point of law that neither of these items constituted a legal or equitable claim against the United States. It is wholly immaterial whether the claim be a legal or an equitable claim, as in either view, under the act of 1797, ch. 74, as was decided by this Court in the case of The United States v. Wilkins, 6 Wheat. 135, it constitutes a good ground of set-off, or deduction. It is not sufficient to establish that these items ought to be rejected, that there is no positive law which expressly provides for, or fixes such allowances. There are many authorities conferred on the dif-

[Gratiot v. The United States.]

ferent departments of the government, which for their due execu-
tion, require services and duties to be performed, which are not
strictly appertaining to, or devolved upon any particular officers,
or which require agencies of a special discretionary nature. In
such cases the department charged with the execution of the
particular authority, business, or duty, has always been deemed,
incidentally, to possess the right to employ the proper persons to
perform the same, as the appropriate means to carry into effect
the required end; and also the right, when the service or duty is
an extra service or duty, to allow the persons so employed a
suitable compensation. This doctrine is not new in this Court;
but it was fully expounded in the cases of The United States v.
M'Daniel, 7 Peters, 1; The United States v. Ripley, 7 Peters,
18; and The United States v. Fillebrown, 7 Peters, 28.

To sustain the refusal of the Court in the present case, it is,
therefore, indispensable to show that there is some law which
positively prohibits, or by just implication denies any allowance
of the disputed items, or of any part thereof. We know of no
law which has such an effect, or which contains any such pro-
hibition or denial. It is true that the act of the 16th of March,
1802, ch. 9, which provided for the organization and establish-
ment of the corps of engineers, in one of its sections (sec. 27)
declares, "That the said corps, when so organized, shall be sta-
tioned at West Point, in the state of New York, and shall con-
stitute a military academy; and the engineers, assistant engineers,
and cadets, of the said corps, shall be subject, at all times, to do
duty in such places, and on such service as the President of the
United States shall direct." But, however broad this enact-
ment is in its language, it never has been supposed to authorize
the President to employ the corps of engineers upon any other
duty, except such as belongs either to military engineering, or to
civil engineering. It is apparent, also, from the whole history
of the legislation of Congress on this subject, that, for many years
after the enactment, works of internal improvement and mere
civil engineering, were not, ordinarily, devolved upon the corps
of engineers. But, assuming the President possessed the fullest
power, under this enactment, from time to time to employ any
officers of the corps in the business of civil engineering, still it
must be obvious, that as their pay and emoluments were, or

would be regulated with reference to their ordinary military and other duties, the power of the President to detach them upon other civil services, would not preclude him from contracting to allow such detached officers a proper compensation for any extra services. Such a contract may not only be established by proof of some positive regulation, but may also be inferred from the known practice and usage of the War Department in similar cases, acting in obedience to the presumed orders of the President. Now it is perfectly consistent with the record in this case, that the defendant might have offered direct or presumptive evidence of such a contract, either express or implied, from the practice and usage of the War Department, applicable to the very services stated in some, at least, of the disallowed items. We do not say that he could, in point of fact, have established any such contract, or any legal or equitable right to such allowances. That is a point on which we have no right to pass judgment, since he was stopped from offering any proof whatsoever at the very threshold of the inquiry. In short, unless some law could be shown establishing clearly and unequivocally the illegality of each of these items; which, as we have said, has not been shown; the refusal of the Court to admit the evidence cannot be supported; and we are, therefore, of opinion that this exception was well taken; and that there was error in the refusal of the Circuit Court.

The third exception opens this matter still more fully and exactly; for there the defendant offered certain depositions and documents, as proofs to establish that he had rendered services over and above the regular duties of his office, and the value of such extra services, and the established usage and practice of the government in allowing to engineers and other officers their claims for extra compensation for the like services. This evidence the Court also rejected, as the record asserts, as incompetent and irrelevant; but, undoubtedly, upon the more broad ground on which the evidence offered under the first exception, was rejected, that the claims had no just foundation in law. That the evidence so offered would, in point of fact, have maintained the asserted statements, we have no right, absolutely, to affirm. That it was competent and relevant for the purpose for which it was offered, and proper for the consideration of the jury,

as conducing to the establishment of the facts, has not been denied at the argument, and, indeed, seems not to admit of any well founded doubt. A very elaborate examination and analysis of this evidence, and of its supposed bearing and agency on the merits of each of the claims has been gone into at the bar; but, in the view which we take of the case, it is matter of fact, belonging, in a great measure, if not altogether, to the consideration of the jury, and with which, as a Court of Error, we are not at liberty to intermeddle. Without, therefore, taking up more time upon this point, it is only necessary for us to say that, for the reasons already stated, we are of opinion there was error also in the Circuit Court in excluding the depositions and documents so offered, from the jury.

But as the merits of these claims have been fully argued before us, upon several points of law, as well as upon certain admitted conclusions of fact, as if the evidence had been admitted, and both parties desire our opinion in respect to the matters of law connected with these facts; we have deemed it right, for the purpose of bringing this protracted controversy within narrower limits, upon the new trial in the Circuit Court, to state some of the views now entertained by the Court upon these points.

I. As to the first item. It purports to be founded on certain Regulations of the Army, which are spread upon the record, and which received the sanction of the President in 1821 and 1825. The 67th article of the Regulations of 1821, provides as follows.

1. "The chief of the corps of engineers shall be stationed at the seat of Government, and shall be charged with the superintendence of the corps of engineers, to which that of the topographical engineers is attached; he shall also be inspector of the military academy, and be charged with its correspondence.

2. "The duties of the engineer department will comprise the construction and repairs of fortifications, and a general superintendence and inspection of the same, military reconnoitrings, embracing general surveys and examinations of particular sites for fortifications, and the formation of plans and estimates in detail for fortifications for the defence of the same, with such descriptive and military memoirs as may be necessary to establish the importance and capabilities of the position intended to be occupied; the general direction of the disbursements on fortifica-

tions, including purchases of sites and materials; hiring workmen, purchases of books, maps, and instruments; and contracts for the supplies of materials, and for workmanship.

14. "Where there is no agent for fortifications, the superintending officer shall perform the duties of agent, and while performing such duties, the rules and regulations for the government of the agents shall be applicable to him; and as a compensation for the performance of that extra duty, he will be allowed, for moneys expended by him in the construction of fortifications at the rate of two dollars per diem, during the continuance of such disbursements; provided the whole amount of emolument shall not exceed two and a half per cent. on the sum expended."

The 67th article of the Regulations of 1825, provides as follows:

888. "The duties of the engineer department comprise reconnoitring and surveying for military purposes, and for internal improvements, together with the collection and preservation of topographical and geographical memoirs, and drawings referring to those objects; the selection of sites, the formation of plans and estimates, the construction, repair, and inspection of fortifications, and the disbursements of the sums appropriated for the fulfilment of those objects severally, comprising those of the military academy; also the superintendence of the execution of the acts of Congress, in relation to internal improvement, by roads, canals, the navigation of rivers, and the repairs and improvements connected with the harbours of the United States, or the entrance into the same, which may be authorized by acts of Congress, with the execution of which the War Department may be charged."

893. "The engineer superintending the construction of a fortification, will disburse the moneys applied to the same, and as compensation for the performance of that extra duty, will be allowed at the rate of two dollars per diem during the continuance of such disbursements, provided the whole amount of emolument shall not exceed two and a half per cent. on the sum disbursed."

So far as the present item is concerned, these regulations do not differ in substance. They both raise the question as to the proper interpretation of them whether the allowance of two

dollars per diem, not exceeding two and a half per cent., is intended to be limited to a single per diem allowance; notwithstanding the engineer superintending the construction, and disbursing the moneys, as agent for fortifications, is employed at the time upon several fortifications, each requiring separate accounts of the disbursements to be kept, on account of there being distinct and independent appropriations therefor; or whether the per diem allowance is cumulative, that is to say, two dollars a day for every fortification, for which there is a distinct and independent appropriation, of which separate accounts are required to be kept, and the disbursements are confided to one and the same engineer, as superintendent and agent of disbursements. The Court are of opinion that the latter is the true construction of the Regulations; upon the ground, that it would be unreasonable to suppose that these Regulations intended to give the same exact amount of compensation to a person disbursing moneys upon two or more distinct fortifications, that he would be entitled to if he were disbursing agent for one only; although his duties might be thus doubled, and even trebled; and that the natural import of the language is, that the compensation is to be given to each agent of a separate fortification, for his disbursements about that particular fortification, without any reference to the consideration whether his agency was limited to that, or extended to other fortifications. Under such circumstances, as the defendant was the disbursing agent, both at Fort Monroe and Fort Calhoun, under distinct and independent appropriations, there does not seem to be any reason why he may not be entitled to the per diem allowance which he claims for each of those forts.

2. As to the second item. The right to the commissions charged for disbursing thirty-three thousand four hundred and forty-seven dollars and twenty-six cents, on account of contingencies on fortifications, must, essentially, depend upon the evidence which may be adduced in support of the claim. There is nothing in the character of the item which precludes the defendant from showing that he is entitled to the commissions of two and a half per cent., or of a less amount, if he can prove that the disbursements were other than those on Forts Monroe and Calhoun; and that it has been the usage of the Department to make the like compensation for disbursements under the like circumstances, or that the

allowance is just and equitable in itself. The Court are of opinion that evidence ought to have been admitted to establish it.

3. As to the third item, constituting a charge of thirty-seven thousand two hundred and sixty-two dollars and forty-six cents, for extra services in conducting the affairs connected with the civil works of internal improvements, very different considerations may apply. The Court are of opinion that, upon its face, this item has no just foundation in law; and, therefore, that the evidence which was offered in support of it, if admitted, would not have maintained it. The ground of this opinion is, that upon a review of the laws and regulations of the government, applicable to the subject, it is apparent that the services therein alleged to be performed were the ordinary special duties appertaining to the office of Chief Engineer; and such as the defendant was bound to perform, as Chief Engineer, without any extra compensation over and above his salary and emoluments as Brigadier General of the army of the United States, on account of such services. In this view of the matter the Circuit Court acted correctly in rejecting the evidence applicable to this item.

Upon the whole, upon the other grounds already stated, the judgment of the Circuit Court must be reversed; and the cause remanded with directions to that Court to award a venire facias de novo.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Missouri, and was argued by counsel. On consideration whereof, it is the opinion of this Court, that there was error in the said Circuit Court in rejecting the evidence offered by the defendant, (Gratiot,) in support of his claims set forth in the first bill of exceptions; and, also, error in refusing to allow the depositions and documents to be given in evidence stated in the third bill of exceptions, for the purposes for which the same was offered by the said defendant. It is thereupon now ordered and adjudged by this Court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, reversed, and that this cause be, and the same is hereby, remanded to the said Circuit Court, with directions to award a venire facias de novo.