### MEREDITH v. UNITED STATES.
### No. 49721.

United States Court of Claims.
June 8, 1954.

Richard C. Shortall, San Francisco, Cal., for plaintiff.

Arthur E. Fay, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

Plaintiff, a former Supply Corps Officer, United States Naval Reserve, brings this action to recover the sum of $4,039.43, which represents the amount of pay and allowances withheld and applied in partial satisfaction of an alleged indebtedness to the United States resulting from losses alleged to exist after investigation of his accounts as Officer-in-Charge at the United States Naval Commissary Store, Mare Island Naval Shipyard, Vallejo, California.

Plaintiff, a citizen of the United States, a resident of the State of California, on February 15, 1943, entered on active duty in the United States Navy in the rank of lieutenant (junior grade) and was immediately assigned as the Assistant Officer-in-Charge at the United States Naval Commissary Store (hereinafter referred to as Commissary Store) Mare Island Naval Shipyard, Vallejo, California. The plaintiff had received no Navy training or indoctrination before entering upon his duties.

On December 18, 1943, he became the Officer-in-Charge at the Commissary Store, serving in that capacity until May 1946. He handled money and signed public vouchers, and was considered a disbursing officer.

The Commissary Store was not intended to operate for profit, but for the purpose of providing authorized personnel the opportunity to purchase stock at the lowest possible prices. A profit balance of approximately $15,000 was maintained in the store. If the profit balance were to exceed or be less than that figure, the prices were to be adjusted to return to such a balance during future operations, even if it were necessary to operate temporarily at a loss.

Plaintiff pursued a system with respect to the keeping of a voucher-control record that had been previously inaugurated when the store was established. On the average of three or four times a year the Bureau of Supplies and Accounts made periodic inspections of the commissary operations and no recommendation was ever made for any change in the method of keeping the records. Criticism was made from time to time that the store was understaffed and plaintiff was commended on several occasions for the manner in which he was operating the store.

After the cessation of hostilities in World War II, Navy enlisted men and Reserve officers were being systematically discharged and released under the existing point system. The plaintiff was eligible for release from active duty, but agreed to remain in the service for approximately 14 months at the specific request of his superior officer. After August 1945, the plaintiff was confronted with a constant turnover of his store personnel, and had assigned to him an inadequate, inefficient, and incompetent force to operate the Commissary Store. After August 1945, the operation of the Commissary Store was further complicated by large consignments of Navy surplus and excess material, such as clothing, cameras, silverware, radios, phonographs, etc., to be disposed of to Navy personnel. Before that time the Commissary Store was of the nature of the ordinary retail grocery operation. The plaintiff complained in person to the Admiral in command of the Mare Island Naval Shipyard that the added volume of stock and material could not

be handled safely with the personnel assigned. He was instructed to proceed to handle the excess material in order to benefit the Mare Island personnel in the disposal program. The occasion of the interview with the Admiral was brought about by complaints that civilian stores elsewhere were carrying items of Navy surplus material which were not available at the Commissary Store. The surplus material at the store was to have a markup of five percent of the direct cost to the Navy Department. At one time the plaintiff requested in writing that the surplus material be transferred to another store, which request was denied.

In the operation of the Commissary Store, incoming merchandise was received and placed in a bulk storeroom, at which time a record was to be made on stock cards. Whenever stock was transferred from the storeroom to the salesroom, appropriate notations were to be made on the stock cards. The only accounting of disposal of stock in the salesroom was in the form of cash receipts on sales, recorded by cash registers.

For each of the months of March and April 1946, the Commissary Store personnel compiled an inventory of the stock on hand which reflected a loss of stock, or operational loss, to the extent of about $10,000 on each inventory.

Because of the type of personnel assigned to the store the plaintiff had no confidence in the results of the inventory and believed them to be incorrect. He made a cursory check and discovered some items missing from the inventories, and thereupon added $10,000 to each inventory.

On or about May 18, 1946, a Board of Investigation was convened and investigated the Commissary Store. Their findings showed an operating loss to the Commissary Store of $21,022.34, and the opinion of the board was that it could not definitely be determined how or when said operating loss occurred, and it was their opinion that said loss could have

been incurred by any one or a combination of the following, which may have extended over an indefinite period:

(*a*) Errors in selling price set below cost.

(*b*) Partially by pilfering by customers.

(*c*) Inefficiency and possible dishonesty by cash register operators.

(*d*) Possible fraudulent arrangement between personnel of store and dealers to receipt for material not delivered.

(*e*) Theft by personnel of store.

Plaintiff was then tried by a court-martial board and was found guilty on two charges. The first charge was that of falsifying the inventories. The second charge was inefficiency in office which was the keeping of an improper voucher-control record. The court-martial board sentenced the plaintiff to be dismissed from the United States naval service and to lose pay amounting to $500. This sentence was later remitted and plaintiff was permitted to resign under honorable conditions.

The plaintiff's orders releasing him from the naval service directed his disbursing officer to settle his account.

However, at the time of plaintiff's release from active duty on July 21, 1947, his pay was withheld in the sum of $4,-039.43, none of which has ever been paid, although plaintiff made demand therefor at the time of his release from duty.

The facts in this case are not in dispute and the issue is whether or not the Bureau of Supplies and Accounts was justified in withholding plaintiff's pay. The Bureau of Supplies and Accounts relied solely on the Act of March 29, 1894, 28 Stat. 47, as amended by the Act of June 10, 1921, 42 Stat. 24, 31 U.S.C.A. §§ 89–90, for its authority.

■ Defendant cites, in support of its contention that plaintiff's compensation was properly withheld, the case of Gratiot v. United States, 15 Pet. 336, 40 U.S. 336, 10 L.Ed. 759, and The Atchison, Topeka and Santa Fe Railway Company v.

United States, 94 F.Supp. 677, 118 Ct.Cl. 194. We are in complete accord with the rulings in the above-cited cases which hold that withholding plaintiff's compensation was required by law and in addition to its legal requirement to withhold payment of any compensation the government had the common right as a creditor to apply unappropriated moneys of a debtor, in its hands, in satisfaction or partial satisfaction of a debt due it. However, the language of the act relied on Act of March 29, 1894, supra, authorizes the debiting of the account of an officer for "any charge against any officer or agent entrusted with public property, arising from any *loss* accruing by his *fault,* to the government as to the property so entrusted to him." (Italics supplied.)

The decision of the court-martial board does not establish a *loss* to the government nor does it indicate any *fault* on the part of the plaintiff as to the so-called operating loss. Furthermore, there is a total lack of evidence in this case establishing a loss to the government or that if a loss occurred, it accrued by the plaintiff's fault.

The case of United States v. Du Perow, D.C., 208 F. 895, cited by the government and relating to the certificate of the appropriate auditor, when introduced in evidence, makes a *prima facie* case for the government and shifts the burden on the defendant to account for it or to prove any claimed deterioration in its value. We do not deem it necessary to discuss the case in the light of the foregoing conclusions.

In view of the circumstances and evidence in this case, we are of the opinion that no loss was suffered by the government through the fault of plaintiff and that plaintiff should recover from defendant the pay and allowances withheld in the sum of $4,039.43.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.