In re ART METAL U.S.A., INC., Debtor.

Santo LA LOMIA, Trustee, and Glenfed Financial Corporation, Intervenor, Plaintiffs,

v.

UNITED STATES of America GENERAL SERVICES ADMINISTRATION and Pension Benefit Guaranty Corporation, Intervenor, Defendants.

Santo LA LOMIA, Trustee, and Glenfed Financial Corporation, Intervenor, Plaintiffs,

v.

UNITED STATES POSTAL SERVICE and Pension Benefit Guaranty Corporation, Intervenor, Defendants.

Bankruptcy No. 87–03015.
Adv. Nos. 89–0308, 88–0646.

United States Bankruptcy Court,
D. New Jersey.

Nov. 3, 1989.
As Amended Dec. 13, 1989.

Cole, Schotz, Bernstein, Meisel & Forman by Gerald H. Gline, Hackensack, N.J., for Glenfed Financial Corp.

Office of the General Counsel Pension Ben. Guar. Corp. by Carol Connor Flowe, Gen. Counsel, Ralph Landy, Atty., for Pension Benefit Guaranty Corp.

United States Atty. D. of New Jersey by Janice Montana, for General Services Admin., U.S. Postal Service and I.R.S.

Schwartz, Tobia & Stanziale by Ben H. Becker, Montclair, N.J., for Trustee of Art Metal, U.S.A., Inc.

DANIEL J. MOORE, Bankruptcy Judge.

The matter presently before the Court is a motion for partial summary judgment brought by Glenfed Financial Corporation ("Glenfed") for an order declaring that the Pension Benefit Guarantee Corporation ("PBGC") is not entitled to setoff its claims against Art Metal—U.S.A., Inc. ("Art Metal" or "Debtor") against amounts owing to the Debtor by the United States Postal Service ("USPS") and the Government Services Administration ("GSA"). Glenfed claims that the PBGC cannot collect its claim by invoking the common law doctrine of setoff because the PBGC lacks sufficient identity with the United States government.

The PBGC, on the other hand, claims that the requisite mutuality for setoff is satisfied because the PBGC is an agency of the United States government and is eligible to invoke administrative setoff pursuant to 31 U.S.C. § 3701 *et al.* upon promulgation of the appropriate regulations.

This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(b)(2)(B) and (C) and the standing Order of Reference of the United States District Court for the District of New Jersey of July 23, 1984. The following constitutes the Court's findings of fact and conclusions of law.

## STATEMENT OF FACTS

On May 9, 1987, Art Metal filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. The Debtor continued in possession of its assets as a Debtor-in-Possession until December 11, 1987, when a Chapter 11 Trustee was appointed.

On July 27, 1987 Glenfed, a secured lender of the Debtor, commenced an adversary proceeding to determine the validity and extent of its lien. On August 11, 1987, a Consent Order was entered establishing the validity of Glenfed's lien on, *inter alia,* all the Debtor's pre- and postpetition accounts receivable machinery equipment, furniture, fixtures, general intangibles and inventory. Said Consent Order also granted Glenfed a lien and super-priority administrative expense claim on all pre- and postpetition assets of the Debtor, whether or not the subject of Glenfed's perfected prepetition security interest and lien, subject to the allowance of administrative expenses pursuant to 11 U.S.C. § 330(a), 331 and 503(b), to the maximum extent of $50,000.00.

The two categories of claims involved in this case are the claims of the General Service Administration ("GSA"), the Internal Revenue Service ("IRS") and the PBGC against the Debtor, and the Debtor's claims against the United States Postal Service

("USPS") and the GSA. The relevant claims are as follows:

## CLAIMS AGAINST THE DEBTOR

### A. *Internal Revenue Service*

Pursuant to Amendment No. 5 filed March 22, 1989 to its proof of claim dated June 6, 1987, the IRS claims the Debtor is indebted to the United States in the sum of $141,698.31 for unpaid federal withholding taxes, FICA taxes and interest and penalties thereon.

### B. *PBGC*

On July 7, 1988, the United States District Court for the District of New Jersey issued an order, pursuant to 29 U.S.C. § 1342, terminating the Art Metal—U.S.A. Inc. Employees' Retirement Plan (the "Retirement Plan") and the Art Metal–U.S.A., Inc. Employees' Pension Plan (the "Pension Plan") (collectively, the "Plans"), establishing April 12, 1988 as the date of termination for the Plans, and appointing the PBGC as statutory trustee of the Plans. The PBGC has filed two claims for employer liability under 29 U.S.C. § 1362 on its own behalf (the "Employer Liability Claims") and six claims as trustee of the Plans for contributions due the Plans (the "Contribution Claims"). The PBGC claims two of the Contribution Claims are for contributions due each of the Plans accruing after the filing of the Debtor's bankruptcy petition and are therefore entitled to priority under 11 U.S.C. § 507(a)(1); two are for contributions due each of the Plans accruing in the 180 day period preceding the filing of the bankruptcy petition and are therefore entitled to priority under 11 U.S.C. § 507(a)(4); and two are for contributions due each of the Plans before the 180 day period prior to the filing of the bankruptcy petition and are therefore general unsecured claims. Pursuant to the Consent Order dated September 5, 1989, the PBGC's claims for Employer Liability have been reclassified as pre-petition claims not entitled to priority.

The PBGC's amended claims as currently filed are as follows:

|  | Retirement Plan | Pension Plan |
|---|---|---|
| Employer Liability | $1,949,300.00 | $1,001,500.00 |
| Contribution Claims With Priority under: | | |
| 11 U.S.C. § 507(a)(1) | 63,569.00 | 18,595.00 |
| 11 U.S.C. § 507(a)(4) | 72,330.00 | 32,044.00 |
| General Unsecured Claims | 284,053.00 | 197,932.00 |

The proofs of claim for unpaid contributions due the Debtor's pension plans were filed by the PBGC as statutory trustee of the plans, and therefore are not subject to setoff. The PBGC seeks only to offset Art Metal's debt to the PBGC for Employer Liability.

Pursuant to the declaration of Kathy Marticello, F.S.A., M.A.A.A., E.A., the actuary who reviewed the PBGC's estimates of employer liability resulting from the termination of Debtor's Retirement and Pension Plans, the employer liability claims are based on the following:

A contributing sponsor is liable upon termination of a pension or retirement plan, for the total guaranteed benefits to all the participants and beneficiaries under the plan, plus interest as of the termination date. The PBGC calculated the estimated amount by which the projected value of the Plans' unfunded guaranteed benefits (the total value of vested benefits for active and terminated employees) exceed the projected value of the Plans' assets as of the date of termination.

The major cause of the deficiency in the Plans is the loans taken by Art Metal from its Pension and Retirement Plans. In or about February 1987, Art Metal borrowed $1,475,000.00 from the Art Metal Retirement Plan and $1,000,000.00 from the Art Metal Pension Plan. These loans totalling $2,475,000.00, which constitute an asset of both the Plans, were valued by the PBGC at zero when calculating the Employer Liability Claims. Essentially, the PBGC has taken the unsecured claims against Art Metal for the aforementioned loans which it held as trustee for the plans, and "bootstrapped" them to a position from which they could be setoff against the Debts of the USPS and GSA if the Court finds the PBGC has the requisite identity with the United States government.

In the unlikely event that the PBGC recovers 100% of the loan amounts in a possible breach of fiduciary duty action against those who authorized the loans, there would still remain claims for employer liability totalling approximately $474,300 for shortfalls in the Art Metal Retirement Plan and approximately $1,500.00 in the Art Metal Pension Plan. Regardless of the outcome of such an action, there will be monies owing to the PBGC on their Employer Liability Claims. Therefore, the GSA's and USPS's claim for setoff is ripe for adjudication.

## C. *GSA*

The GSA has asserted claims against the Debtor in the amount of $172,695.20 based upon allegations of overcharges, shortages and damaged goods. Additionally, the GSA has also asserted a volume discount claim in the amount of $48,989.00.

## DEBTOR'S CLAIMS AGAINST THE UNITED STATES GOVERNMENT

### A. *United States Postal Service*

All parties agree that $23,352.00 is the principal sum the United States Postal Service owes Art Metal for goods sold and delivered by the Debtor prior to the filing of the petition.

### B. *GSA*

On March 30, 1989, the Trustee in bankruptcy filed a complaint against the GSA for the turnover of $1,209,205.58 based on outstanding pre-petition accounts receivable representing furniture and security files sold over a period of years. The complaint also seeks interest and costs.

By order of this Court dated July 24, 1989, PBGC was granted leave to intervene in this adversary proceeding, Adversary No. 88–0646, as a party Defendant. By order of this Court dated June 6, 1989, Glenfed was granted leave to intervene in this Adversary proceeding, Adversary No. 88–0646 as a party Plaintiff.

The parties have filed and this Court has approved a Stipulation and Order which provides in relevant part:

1. The Debtor's claim against the United States through the GSA, is in the gross amount of $862,000.

2. The GSA's claim against the Debtor for overcharges, shortages and damaged goods is in the amount of $172,695 plus $48,989 for a volume discount including interest at the rate of 8⅞ percent, totalling $221,684.

3. The IRS's claim for prepetition unpaid taxes is in the principal amount of $38,165.09.

4. The United States is entitled to offset the $862,000 debt owing to the Debtor with the $221,684 GSA claim and the $38,165.09 IRS claim against the Debtor, totalling $259,849.29, leaving a balance of $602,-150.71 on the GSA debt.

5. The Debtor is entitled to interest on the $602,150.74 debt in the total amount of $61,091.13 which is 8⅞ percent per annum for a period of one year.

6. The Debtor's claim against the USPS is in the amount of $23,352.

7. Payment by the United States of the $602,150.71 GSA debt plus $61,091.13 interest thereon, plus $23,352 Postal Service debt, totalling $686,593.84 herein, is subject to the final determination including appeals and/or other resolution, of the nature, extent and priority of the PBGC claim herein and of the government's right to offset the aforesaid debt against the PBGC claim, pursuant to 11 U.S.C. § 553.

8. Subject to the foregoing, the United States is hereby granted relief from the automatic stay to deposit the $686,593.84 with the Clerk of the Bankruptcy Court in one or more interest bearing escrow accounts pending final determination of the PBGC claim and the government's right to setoff.

## LEGAL DISCUSSION

A motion for summary judgment filed in an adversary proceeding in a bankruptcy case is governed by Rule 56 of the Federal Rules of Civil Procedure as incorporated by Bankruptcy Rule 7056. Pursuant to Fed.R. Civ.P. 56, summary judgment shall only be

granted if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. 9 *Collier on Bankruptcy 15th Ed,* para. 7056.06 p. 7056–5. In the instant proceeding, because no material facts are in dispute, the Court restricts its analysis to whether Glenfed is entitled to a judgment as a matter of law.

The doctrine of setoff as applied under the bankruptcy code is governed by 11 U.S.C. § 553, which provides in relevant part:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case ...

█ The gravamen of Glenfed's argument in support of their motion for partial summary judgment is that the PBGC as a self-sustaining, independent, non-profit corporation, lacks sufficient identity with the United States government to enable the PBGC to offset their claim against the Debtor by the Debtor's claims against the GSA and USPS.

█ It is axiomatic that before a creditor can employ 11 U.S.C. § 553 to offset a claim he holds against a claim held by a debtor, the creditor must establish that the claims are mutual debts. *In re IML Freight, Inc.,* 65 B.R. 788, 793 (Bankr.D. Utah 1986) 4 *Collier on Bankruptcy, 15th Ed.,* para. 553 at p. 553–17. The term "mutual debt" is not defined by the bankruptcy code, but has been interpreted by courts to require that the debts be in the same right and between the same parties, standing in the same capacity. 4 *Collier on Bankruptcy, 15th Ed.* par. 553.04[2] at 553–18; *In re IML Freight,* 65 B.R. at 793. The basic test of mutuality is not similarity of obligations but whether or not something is owed by each side. *In re IML Freight,* 65 B.R. at 793. The creditor's debt must be owed to the estate of the

debtor and the estate's debt must be owed to the creditor. *Id.* The mutuality requirement of § 553 of the Bankruptcy Code is strictly construed. 4 *Collier on Bankruptcy, 15th Ed.* para. 553.04, p. 553–17; *Virginia Block Co. v. Bushong (In re Virginia Block Co.),* 16 B.R. 560, 5 C.B.C.2d 317 (Bankr.W.D.Va.1981).

It is undisputed as a general proposition of law that the United States government has the right to setoff amounts due it against amounts which it is obligated to pay. *In re Thomas,* 84 B.R. 438, 439 (Bankr.N.D.Tex.1988) *citing Gratiot v. United States,* 40 U.S. (15 Pet.) 336, 10 L.Ed. 759 (1841); *Cherry Cotton Mills v. United States,* 327 U.S. 536, 66 S.Ct. 729, 90 L.Ed. 835 (1946). "The government has the same 'right which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him.' " *United States v. Munsey Trust Co.,* 332 U.S. 234, 239, 67 S.Ct. 1599, 1601, 91 L.Ed. 2022 (1947) *quoting Gratiot v. United States,* 40 U.S. (15 Pet.) 336, 10 L.Ed. 759 (1841).

In addition, "in deciding whether federal agencies stand in the same capacity for section 553 offsets, there is no authority for distinguishing between the capacity of parties in relation to each other outside of bankruptcy and that capacity following the filing of a bankruptcy petition." *United States Through Small Business Administration v. Rinehart,* 88 B.R. 1014, 1016 (D.S.D.1988).

█ The fact that the PBGC is a wholly owned federal corporation has no impact on the Court's determination. As the Supreme Court stated, "That the Congress chose to call it a corporation does not alter its characteristics so as to make it something other than what it actually is, an agency selected by Government to accomplish purely governmental purposes." *Cherry Cotton Mills,* 327 U.S. at 539, 66 S.Ct. at 730.

The principal case governing the United States government's right to employ the doctrine of setoff is *Cherry Cotton Mills.*

*Cherry Cotton Mills* involved a taxpayer who had instituted suit against the United States for a tax refund in the Court of Claims. The United States filed a counterclaim for a debt alleged to be owed to a governmental corporation, the Reconstruction Finance Corporation ("RFC"). The General Accounting Office had directed the Treasury not to pay the tax refund, but to issue a check for the amount of the refund payable to the RFC "to partially liquidate" petitioner's indebtedness to that governmental agency. The Supreme Court upheld the Court of Claims' jurisdiction to hear the government's counterclaim asserting the right of setoff based upon the following six characteristics of the RFC:

(1) Its Directors are appointed by the President of the United States;

(2) Its Directors are confirmed by the Senate;

(3) It's activities are all aimed at accomplishing a public purpose;

(4) All of its money comes from the Government;

(5) Its profits, if any, go to the Government; and

(6) Its losses the Government must bear.

*Id.* at 539, 66 S.Ct. at 730.

The holding in *Cherry Cotton Mills* is distinguishable from the case at bar because the RFC and the PBGC differ significantly in three respects: (1) the profits of the PBGC, if any, do not go to the United States government, (2) the PBGC's losses are not borne by the United States government, and (3) none of its money comes from the Federal Government.

The PBGC asserts that its profits go to the United States government. Pursuant to 29 U.S.C. § 1305, "There are established on the books of the Treasury of the United States four revolving funds to be used by the [PBGC] in carrying out its duties under this title." 29 U.S.C. § 1305(a). In addition, pursuant to 29 U.S.C. § 1302(g), the receipts and disbursements of the PBGC are included in the totals of the budget of the United States.

However, Glenfed asserts, and the Court agrees, that the profits of the PBGC do not go to the United States government. The

PBGC was incorporated as a non-profit corporation. 29 U.S.C. § 1302(b). Pursuant to the express language of 29 U.S.C. 1305(a), the use of the PBGC funds deposited in their accounts with the Treasury is limited to carrying out the PBGC's duties as prescribed by Title 29. The use of any profits or "funds in excess of need," is limited. 29 U.S.C. 1305(b)(3) provides that in the event the PBGC determines that it has money in any of its funds in excess of its current needs, "it may request the investment of such amounts as it determines advisable by the Secretary of Treasury in all obligations issued or guaranteed by the United States but, until all its borrowings [from the United States Treasury] have been repaid, the obligations in which such excess moneys are invested may not yield a rate of return in excess of the rate of interest payable on such borrowings." As Glenfed accurately states, to the extent that the PBGC has surplus revenue, the United States government cannot use it to fund other programs, or to make general expenditures, such as to build the B–1 bomber or to help the GSA pay Art Metal's bill for furniture and security files. Response by Glenfed Financial Corporation to the PBGC's Supplemental Reply and in Further Support of its Motion for Partial Summary Judgement at p. 12.

The PBGC also claims the losses of the PBGC are borne by the United States government. This, they claim is shown by the fact that the finances of the PBGC have a significant impact on the federal deficit. At present, the PBGC accounts show a deficit which exceeds $2 billion. The PBGC asserts that this deficit is included in the current federal budget as a deficit under the heading "total government equity," *Budget of the United States,* 1990 Fiscal Year, Appendix I—p. 10. PBGC also claims that employer liability claims such as those presently before the Court have an enormous impact on the PBGC's revolving accounts, and consequently, on the federal deficit. PBGC further argues that if the employer liability and related accounts receivable recorded by PBGC over the last three years prove to be

worthless, the PBGC deficit and consequently the United States government deficit will increase by an additional $379 million. The collection of the Employer Liability Claims, argues the PBGC, is therefore critical to the finances of the United States Government.

PBGC's argument as articulated in its brief to the Court differs dramatically from its Annual Report to the Congress, Fiscal Year 1988 (88 Annual Report). In Notes to Financial Statements at page 42 of the 88 Annual Report—Note 1—Significant Accounting Policies advises:

"ERISA requires that the PBGC programs be self-financing. The Corporation finances its operations through premiums collected from ongoing covered plans, investment income, and the collection of employer liability payments due under ERISA as amended.

In addition, the PBGC may borrow up to $100 million from the U.S. Treasury to finance its operations. The Corporation did not use this borrowing authority during the years ended September 30, 1988, or September 30, 1987, nor is use of this borrowing authority currently planned. ERISA provides that the U.S. Government is not liable for any obligation or liability incurred by the PBGC."

The same Appendix I referred to by PBGC reflects at page 9 the following:

Financing.—The primary source of financing is a per capita annual premium paid by sponsors of ongoing covered plans, which varies according to the plans' funding level. Other sources of financing include assets from terminated plans, investment income, and amounts due the Corporation from the sponsors of terminating plans. Also, the Corporation is authorized to borrow up to $100 million from the U.S. Treasury.

The foregoing quotes from the 88 Annual Report and the 1990 Budget reflect clearly that none of the money utilized by the PBGC comes from the government (except as investment income).

In actual fact, the losses of the PBGC are not borne by the United States government. Although the receipts and disbursements of the PBGC are included in the totals of the budget of the United States government, this Court agrees with the Court in *Bechtel v. Pension Benefit Guaranty Corp.* that this is done solely for reporting purposes. *Bechtel v. Pension Benefit Guaranty Corp.*, 624 F.Supp. 590, 592 Fn. 3 (D.D.C.1984), *aff'd Bechtel v. Pension Benefit Guaranty Corporation*, 781 F.2d 906 (D.C.Cir.1986). Appendix I—p. 9 to the 1990 Federal Budget reflects that the net effect of including the PBGC receipts and disbursement is zero. The total items in the Financing section of the analysis of Program and Financing is equal to the total of obligations. There is no amount for the line item Budget Authority. Conclusive proof that the PBGC's losses are not borne by the United States government is found in 29 U.S.C. § 1302(g)(2) which provides that "The United States is not liable for any obligation or liability incurred by the corporation [the PBGC]". *Id.*

The Supreme Court issued its decision in *Cherry Cotton Mills* on March 25, 1946. The PBGC was established by Congress pursuant to 29 U.S.C. § 1302 on September 2, 1974. By establishing the PBGC as a separate self-sustaining entity whose profits do not go to the United States government while disclaiming the United States government's liability for the obligations of the PBGC, Congress filled a void in the insurance industry that might not have otherwise been filled by the private sector. In limiting the United States Treasury's exposure for losses in such an unstable market, Congress effectively denied the PBGC the right to setoff its claims against the debts of the agencies of the United States government pursuant to 11 U.S.C. § 553 by removing a critical element of mutuality.

The PBGC cites a number of cases which recognize the PBGC as an agency of the United States government for a variety of purposes. In *Pension Benefit Guarantee Corp. v. Ouimet Corp.*, 470 F.Supp. 945 (D.Mass.1979), *aff'd*, 630 F.2d 4 (1st Cir. 1980), the Court held that the PBGC is an administrative agency of the federal government subject to the Administrative

Procedure Act. *Id.* at 949. In *Williams v. Pension Benefit Guarantee Corp.*, 5 E.B.C. 1668 (D.N.J.1984), the Court held that the PBGC is an agency of the federal government for the purposes of recouping and setting off sums of money originally distributed by the PBGC by error of fact. *Id.* at 1669. In *Bechtel v. PBGC*, 624 F.Supp. 590 (D.D.C.1985) *aff'd*, 781 F.2d 906 (D.C.Cir.1986) the Court held that the PBGC is a government agency for the purposes of recouping payments in excess of statutorily guaranteed benefits made by the PBGC to participants in terminated employee pension plans. *Id.* at 592.

The PBGC asserts that because the PBGC is a government agency, it has sufficient identity with the United States for common law setoff purposes. In addition, the PBGC's status as an agency of the United States government entitles it to employ administrative setoff pursuant to 31 U.S.C. § 3701 *et al.* upon promulgation of the appropriate regulations. This, the PBGC claims, further supports its position that it has sufficient identity with the Federal government for § 553 setoff. Essentially, the PBGC asserts that this Court is bound by Congress' determination that the PBGC is entitled to employ administrative setoff for common law setoff purposes, and that the "sufficient identity with the United States government" requirement for the purposes of common law setoff can be no more narrowly defined than the perimeters set by Congress for administrative setoff.

This Court disagrees. The Debt Collection Act ("DCA"), 31 U.S.C. § 3701 *et al.* is the manifestation of Congress' concern for the increasing backlog of unpaid debts owed to the federal government. *S.Rep. No. 378, 97th Cong.*, 2nd Sess. 2 (1982), U.S.Code Cong. & Admin.News 1982, 3377, 3378. The main purpose of the DCA was to "facilitate substantially improved collection procedures in the Federal government." *Id.* at 1, U.S.Code Cong. & Admin. News 1982, p. 3377. Regardless of whether the agencies of the United States government can employ common law setoff, provided the requisite regulations have been promulgated under the DCA, those agencies can now employ administrative setoff. The two doctrines of setoff are wholly independent of each other and an agency's ability to invoke administrative setoff has no impact on the Court's decision when addressing the issue of common law setoff.

Although the aforementioned decisions holding the PBGC is an agency of the United States government would be relevant to a Court's determination of whether the PBGC is entitled to invoke administrative setoff pursuant to the Debt Collection Act, the availability of administrative setoff to the PBGC is not in issue here. It is undisputed that the PBGC has not promulgated the regulations required by 31 U.S.C. § 3716. Therefore, the PBGC does not have the authority to employ administrative setoff.

The PBGC further asserts that pursuant to the holdings in *U.S. Through Small Business Admin. v. Rinehart*, 88 B.R. 1014 (D.S.D.1988) and *In re Thomas*, 84 B.R. 438 (Bankr.N.D.Tex.1988), that as an agency of the federal government, the PBGC is eligible to employ § 553 to setoff its claims.

The decision in *Rinehart* is distinguishable from the case at bar in that the *Rinehart* court was addressing the doctrine of administrative setoff as opposed to common law setoff. It is undisputed that the PBGC is ineligible to employ administrative setoff because of its failure to promulgate the regulations required by 31 U.S.C. § 3716.

The Court in *In re Thomas* considered whether a setoff would be allowed between the Farmers Home Administration ("FmHA"), the Small Business Administration ("SBA") the Commodity Credit Corporation ("CCC") and the Internal Revenue Service ("IRS"). The Court allowed the FHA, the SBA, the CCC and the IRS to setoff their claims against the debtor's entitlement of monies from disaster payments under the Agricultural, Rural Development and related Agencies Appropriations Act of 1987. The Court based its decision on the "long-established governmental right of setoff" without discussing the relevant

characteristics of each of the agencies involved. *Id.* at 440. The United States government, like any creditor, has the ability to employ common law setoff subject to the strictly construed mutuality requirement provided for in 11 U.S.C. § 553. Because the characteristics of the agency asserting the right of setoff are essential to any Court's determination of whether said agency is eligible to setoff its claims, *In re Thomas* is of little value to the resolution of the issue at bar.

▆▆▆ Further support for the Court's position can be found in *Federal Savings & Loan Insurance Corporation v. Williams,* 599 F.Supp. 1184 (D.Md.1984), where the Court was faced with an issue very similar to the issue at bar. The Federal Savings & Loan Insurance Corporation ("FSLIC") had instituted an action against the former officers, directors and employees of County Federal Savings and Loan Association ("County"), a federally chartered savings and loan association insured by the FSLIC. The FSLIC alleged that the defendants among other things, intentionally and/or negligently breached their fiduciary duties, were guilty of waste, committed fraud and diverted corporate opportunities. The defendants filed a number of counterclaims against the United States asserting that the losses and damages suffered by County were caused or at least significantly contributed to by the wrongful conduct of federal agents, and that those federal agents and ultimately the United States should bear the responsibility. As the Court stated, "the United States, as sovereign, is immune from suit except where it has consented to be sued." *Id.* at 1197. However, absent a statutory waiver of sovereign immunity, "a counterclaim against the United States for recoupment[1] is appropriate only in those instances where the United States brings suit. Counterclaims against the United States in the nature of

recoupment do not require a statutory waiver of sovereign immunity." *Id.* at 1202.

The Court was then required to decide whether the FSLIC, who actually commenced the suit, had sufficient identity with the United States to warrant a finding that the United States was the plaintiff in that action. The Court stated the action was commenced by the FSLIC in two capacities: (1) as assignee of the claims of the bank which inherited said claims from Colony, and (2) as a federal regulatory agency. The Court held that because the FSLIC instituted the action at least in part as a federal regulatory agency, the FSLIC would be susceptible to counterclaims for recoupment. *Id.* at 1202. However, the counterclaims being addressed were filed against the United States. This, the Court held was inappropriate because the United States was not the plaintiff in that action. "The United States is not synonymous with the FSLIC ..." *Id.* The two are "separate and distinct" for the purposes of recoupment. *Id.*

The basis of the Court's holding was that the FSLIC, although a government corporation, is not an "integral part of the government mechanism." *Id.* at 1203, *citing Lapadula & Villani, Inc. v. United States,* 563 F.Supp. 782, 784 (S.D.N.Y. 1983). The holding was based on the following characteristics of the FSLIC:

(1) The FSLIC has, as the source of its funds, insurance premiums and assessments from insured associations.

(2) Its funds, with the exception of amounts needed for operations and investments, are held in a special account by the Secretary of Treasury.

(3) FSLIC monies not required for current operations shall be deposited in the treasury of the United States or invested in obligations of, or guaranteed as to

---

1. The major distinguishing factor between setoff and recoupment is recoupment involves a claim and a counterclaim arising out of the same transaction, whereas setoff usually involves a counterclaim extrinsic to the original claim. 4 *Collier on Bankruptcy,* para 553.03, p. 553–12– 13. Pursuant to 11 U.S.C. § 553, the application of setoff in bankruptcy is limited. However, because the claims involved in recoupment arose from the same transaction, Courts have held applying the limitations or setoff in bankruptcy would be inequitable. *See Ashland Petroleum Co. v. Appel (In re B & L Oil Co.),* 782 F.2d 155, 157 (10th Cir.1986). For the purpose of its application to the case at bar, the difference *is* irrelevant.

principal and interest by, the United States.

(4) The FSLIC's reserves are not covered in the general treasury of the United States as miscellaneous receipts nor are funds deposited by the FSLIC available for general expenditures.

(5) By definition, a counterclaim for recoupment requires that the claim, if satisfied, will reduce, defeat or diminish the government's recovery of damages.

(6) The public treasury would not be affected by the success or failure of the FSLIC in that litigation. Were the FSLIC to recover compensatory damages, those funds would be deposited in an account available for use only by the FSLIC. They would not inure to the benefit of the United States nor would any loss arising from their litigation be born by the United States.

*Id.* at 1204.

The issue of whether the FSLIC has sufficient identity with the United States government in an action brought by the FSLIC to enable the defendants to assert a counterclaim against the United States in the nature of recoupment is essentially the same issue as whether the PBGC has sufficient identity with the United States to allow the USPS and the GSA to setoff their debts against the claims of the PBGC. The PBGC and the FSLIC share the following two relevant characteristics.

First, the profits of neither corporation go to the United States government. Both corporations have accounts with both the Secretary of Treasury established to be used by the corporation in carrying on its present duties. *See.* 12 U.S.C. § 1725(d) and 29 U.S.C. § 1305(g). The funds deposited by both corporations are not available for general expenditures by the United States government. The monies in excess of needs either remain in the corporations' accounts with the Treasury or are invested in obligations issued or guaranteed by the United States government. *See* 29 U.S.C. § 1305(b)(3) and 12 U.S.C. § 1725(d). The funds recoverable in an action commenced by either the FSLIC or the PBGC would not inure to the benefit of the United States.

Also, like the FSLIC in *Williams,* the outcome of the PBGC's claim will have no effect on the United States Treasury. Any overall loss suffered by the PBGC with respect to the Art–Metal Plans, will not be borne by the United States government.

For the foregoing reasons, it is the opinion of the Court that the element of mutuality which is prerequisite to the right of setoff preserved by 11 U.S.C. § 553(a) has not been established. The PBGC lacks sufficient identity with the United States government to enable claims of the PBGC to be setoff against the claims the debtor holds against the GSA and the USPS. To hold otherwise would have the effect of using property of the Debtor's estate, at the expense of the creditors of Art Metal, to reduce premiums that would normally be charged to sponsors of private pension plans. Partial summary judgment is hereby granted on the motion of Glenfed.

■ Pursuant to 11 U.S.C. § 362(a)(7), even a valid right of setoff is stayed by the filing of bankruptcy. *In re IML Freight, Inc.,* 65 B.R. at 791 *citing United States v. Norton,* 717 F.2d 767, 772–73 (3rd Cir. 1983); *Small Business Administration v. Rinehart,* 88 B.R. at 1018. However, because the PBGC does not have a valid setoff claim, an in depth discussion concerning the effect of the automatic stay on a creditor's right to setoff is unnecessary.

Counsel for Glenfed Financial Corporation shall submit an order in conformity with this opinion within ten days from the date hereof.